STATE OF MAINE
CUMBERLAND, ss.

RUSSELL BLACK, *et al.*, )
       )
           Plaintiffs, )
       )
          v. )
       )
       )
ANDY CUTKO, *et al.*, )
          Defendants. )

**DECISION AND ORDER**
**(14 M.R.S.A. § 5953 & M.R. Civ. P. 80C)**

In 1993 the people of Maine decided that their public lands were worthy of constitutional protection. Through their ratification of Article IX, Section 23 of the Maine Constitution, designated public lands cannot be "reduced" or their "uses substantially altered" unless two thirds of both houses of the Maine Legislature agree to any such change. The central question presented in this case is whether certain decisions made in 2014 and 2020 by the Bureau of Public Lands ("BPL"), the Executive Branch agency that holds title to the lands for the benefit of all Maine people, complied with this unique and consequential Amendment.

In analyzing this question, a number of significant issues of first impression have been identified by the Court and the parties. The Court therefore encouraged the parties at various stages of this litigation to agree to a Report of at least some of those questions directly to the Law Court pursuant to Rule 24 of the Maine Rules of Appellate Procedure. However, the parties could not agree on a Stipulated Record which would permit the Court to make such a report under Rule 24(a), and BPL decided not to move for such a Report under Rule 24(c) after the Court ruled against it on a potentially dispositive issue.

Plaintiffs in this action challenge BPL's 2014 and 2020 decisions to lease to Central Maine Power Company ("CMP") [1] portions of two parcels of public reserved land to construct part of the New England Clean Energy Connect transmission corridor. The lands at issue are located in the Upper Kennebec Region, specifically in West Forks Plantation and Johnson Mountain Township.

Pending before the Court are the parties' respective motions for judgment on Plaintiffs' Declaratory Judgment claim and Plaintiffs' Rule 80C appeal. Both have been fully briefed and are now before the Court for decision. Plaintiffs are represented by Attorneys James Kilbreth, David Kallin, Adam Cote, and Jeana McCormick. Defendants Andy Cutko and BPL are represented by Assistant Attorneys General Lauren Parker and Scott Boak. Defendants CMP and NECEC Transmission, LLC are represented by Attorneys Nolan Reichl and Matthew Altieri.

BACKGROUND

Maine's historical practices regarding its management of public land provide context to the issues presented. A more detailed discussion of that history is outlined in the Court's orders dated December 21, 2020 and March 17, 2021 and are incorporated by reference, but is summarized briefly as follows. After acquiring approximately 7 million acres from Massachusetts upon statehood, Maine sold or gave away all but 400,000 acres of this land, mostly prior to 1890. The remaining 400,000 acres of public land were reserved in each of Maine's unorganized townships as approximately 1000 acre lots. Over the years, the State leased

---

[1] CMP assigned the 2020 lease to NECEC Transmission, LLC in early 2021. NECEC Transmission was joined as a defendant in this case. The Court will refer to them collectively as CMP for the sake of consistency with prior orders in the case.

these public reserved lands at virtually no cost to camp owners, paper companies, and timber companies. In the early 1970s, a reporter published a series of articles in the Portland Press Herald that called attention to Maine's historical management practices and alleged abuses of the public lot leasing program.

In the years that followed, various legal and political efforts were undertaken to preserve the public reserved lands and to ensure their availability for the public's use for generations to come. The culmination of these efforts, legally speaking, was the 1993 Amendment to the Maine Constitution, *see* Me. Const. art. IX, § 23. The Amendment states as follows: "State park land, public lots or other real estate held by the State for conservation or recreation purposes and designated by legislation implementing this section may not be reduced or its uses substantially altered except on the vote of 2/3 of all the members elected to each House." *Id.* The legislation implementing the Amendment designated "public reserve lands" for this constitutional protection, and the West Forks Plantation and Johnson Mountain Township parcels fall within this category. 12 M.R.S.A. §§ 598-B(2-A)(D), 1801(8).

In addition, the Legislature declared when enacting 12 M.R.S.A. Section 1846(1) in 1997 as follows: "[I]t is the policy of the State to keep the public reserved lands as a *public trust* and that full and free public access to the public reserved lands to the extent permitted by law, together with the right to reasonable use of those lands, is the privilege of every citizen of the State." *Id.* (emphasis added).

In the summer of 2014, CMP approached the Governor's Office about its proposed transmission line project and its interest in crossing the West Forks Plantation and Johnson Mountain Township public lots. R. III0001. BPL and CMP proceeded to negotiate a lease agreement. During this process, AAG Lauren Parker, David Rodrigues (BPL's Director of Real

3

Property Management and former Senior Planner), and several others provided input and comments on the various lease drafts, with Mr. Rodrigues at one point inquiring: "Didn't we get a determination from the [Attorney General's] office that a lease is a contract and the legislature should not be able to break an existing contract?" R. III0053.

The lease was ultimately signed on December 15, 2014 ("the 2014 lease"). Under the agreement, BPL agreed to lease to CMP a "three hundred (300) foot wide by approximately one mile long transmission line corridor" (consisting of roughly 33 acres) located on the West Forks and Johnson Mountain public lots. R. I0035–36. The lease specified an initial term of 25 years and established the annual rent at $1400, to be adjusted by an appraisal. [2] *Id.* BPL did not provide notice to the Legislature or to the public of its intentions to enter into the lease; it did not seek or obtain 2/3 legislative approval of the lease; it did not make any contemporaneous written findings as to why it was not seeking legislative approval; and the lease did not come to light until—depending on the version of subsequent events believed by different parties—months or years after it was executed. [3]

Additionally, CMP did not obtain a Certificate of Public Convenience and Necessity ("CPCN") from the Public Utilities Commission ("PUC") prior to entering into the 2014 lease as required by law. *See* 35-A M.R.S.A. § 3132(13). Rather, the CPCN process commenced after the

---

[2] On June 22, 2015, the lease was amended to increase the annual lease payment from $1400 to $3680. R. I0061.

[3] The 2014 lease was briefly mentioned in BPL's annual report to the Legislature's Joint Standing Committee on Agriculture, Conservation, and Forestry, dated March 1, 2016. Specifically, BPL noted: "During 2015 the Bureau saw increased requests for new powerline corridor leases across its lands, reflecting continued interest in wind generation for supplying more 'green' energy to the demand centers in southern New England." R. VII0158. "One lease completed in FY 2015 involves a 300-foot corridor 4,700 feet in length crossing two small public lots in the Forks area." *Id.*

lease was executed, with CMP applying for a CPCN in September 2017. Pls.' R. Add. 30. The PUC ultimately issued a CPCN in May 2019. R. I0002.

During the timeframe in which the CPCN process took place, an issue arose regarding a potential CMP utility line lease that would traverse Cold Stream Forest—a different parcel of public reserved lands. The then-sitting director of BPL asked AAG Parker for an opinion on the prospective lease, inquiring "whether [BPL] … must obtain 2/3 legislative approval, pursuant to either 12 M.R.S.A. § 598-A [] or 5 M.R.S.A. § 6209(6) [], to lease to Central Maine Power Company (CMP) for a transmission line public reserved lands that were acquired with proceeds from the Land for Maine's Future (LMF) Fund." Pls.' R. Add. 1.

In a memorandum response dated July 25, 2018, AAG Parker explained that "12 M.R.S.A § 598-A [the Designated Lands Act] applies, not 5 M.R.S.A. § 6209(6)" and that the proposed transmission line is "measured against the Bureau's multiple use mandate for public reserved lands and its management objectives for Cold Stream Forest, and not against the purposes of the LMF program." *Id.* at 1, 4, 7. She further advised that "the Bureau needs 2/3 legislative approval to lease part of Cold Stream Forest for a transmission line if a transmission line will 'substantially alter' Cold Stream Forest." *Id.* at 6. Thus, AAG Parker concluded that "the Bureau may enter into a valid transmission line lease with CMP if such a lease will not 'substantially alter' the public reserved lands at issue" (*id.* at 1, 7), i.e., the "transmission line will not alter the physical characteristics of Cold Stream Forest in a way that frustrates the purposes for which the Bureau holds Cold Stream Forest." *Id.* at 4 (citing 12 M.R.S.A. §§ 598(5), 598-A). On the "substantial alteration issue," AAG Parker explained that there "is no question that a transmission line will alter the physical characteristics of Cold Stream Forest," and identified various factors for BPL to evaluate in deciding whether the proposed lease would

5

effectuate a "substantial alteration" of that land. *Id.* at 6–7. The record therefore reveals that by late July 2018, BPL seemed to recognize that it was required to conduct a "substantial alteration" analysis pursuant to the Maine Constitution and Maine statute before it entered into a transmission line lease of public reserved lands.

Meanwhile, BPL's management planning process for public reserved lands in the upper Kennebec region (including the Johnson Mountain and West Forks lots) was underway. That process commenced in 2016 and completed on June 25, 2019 with BPL's adoption of the Upper Kennebec Region Management Plan. There is only a brief mention in the plan acknowledging a "new 300-foot wide by mile-long transmission line lease … executed with CMP in December 2014." R. II0093.

In December 2019, Senator Black and several co-sponsors initiated legislation (L.D. 1893) pertaining to the 2014 lease. Pls.' R. Add. at 120–22. As introduced, L.D. 1893 required that any lease of public reserved lands under 12 M.R.S.A. Section 1852 be at reasonable market value and be approved by a supermajority of the Legislature pursuant to Article IX, Section 23. Subsequent committee amendments added new language that directed BPL to terminate the lease and declared that the project would substantially alter the West Forks/Johnson Mountain public reserved lands. Pls.' R. Add. at 123–25. A public hearing on L.D. 1893 took place on January 21, 2020.

As L.D. 1893 worked its way through the legislative process, AAG Parker attended a work session held by the Committee on Agriculture, Conservation, and Forestry ("ACF committee") and answered the committee's questions about her 2018 memorandum regarding the Cold Stream Forest public reserved lands. In an email sent on March 3, 2020, Representative Kinney followed up with AAG Parker, asking her to weigh in on the validity of the 2014 lease

6

and to address two issues: (1) "whether the planned transmission corridor w[ould] 'substantially alter' designated public reserved lands and whether there should have been a vote of two-thirds of the Legislature per the Constitution of Maine" and (2) whether "the [2014] lease [was] valid since CMP did not receive a [CPCN] from the Public Utilities Commission prior to entering the lease agreement with the State."

The following day (March 4, 2020), AAG Parker responded to Representative Kinney. She informed Representative Kinney that prior to entering into the 2014 lease, BPL did not ask the Office of Attorney General ("OAG")—and the OAG did not opine—whether the lease would substantially alter the West Forks/Johnson Mountain parcels. However, she stated that BPL's current view was that it did not need to have obtained 2/3 legislative approval of the 2014 CMP lease because it did not regard the 2014 lease as substantially altering the public reserved lands at issue. AAG Parker informed Representative Kinney that she had since advised BPL that their position was "legally defensible." As to the second issue, AAG Parker explained that BPL considered the lease valid despite it predating the CPCN—a position that she said also was "legally defensible based, at a minimum, on a harmless error standard." AAG Parker acknowledged, however, that only a court could finally determine whether BPL's positions and interpretations were correct. The Parker-Kinney email exchange was forwarded to Defendant Cutko, and several others on March 4th and 5th, 2020. [4]

---

[4] The Court discussed this email with counsel in chambers the day of oral argument. The initial concern was that this email exchange had just surfaced as part of a very prolonged Freedom of Access process. As part of this colloquy, AAG Parker clarified that she was unaware a new lease was under negotiation at the time of her conversation with Representative Kinney in early March 2020 as that was being handled by outside counsel. She also clarified that while the OAG had consulted with BPL on the 2014 lease, their advice was limited to technical lease requirements, and not the issue of "substantial alteration."

The ACF committee unanimously voted that L.D. 1893 "ought to pass." The full Legislature, however, did not consider the bill because it adjourned on March 17, 2020 due to the COVID-19 pandemic.[5]

On March 25, 2020, attorneys for CMP circulated an email enclosing a draft of a "new BPL lease related to NECEC." R. IV0122. Ultimately, CMP and BPL entered into a new lease ("the 2020 lease"), with CMP signing the document on June 15, 2020 and BPL signing it on June 23, 2020. The 2020 lease—captioned "Amended and Restated Transmission Line Lease"[6]— states that it supersedes and terminates the 2014 lease; it slightly clarifies the acreage involved; it contemplates a new annual rent of $65,000; and it authorizes a transfer of the lease from CMP to NECEC Transmission. R. I0001–12. Otherwise, the 2020 and 2014 agreements are largely similar and lease to CMP a 300-foot-wide corridor on the West Forks and Johnson Mountain public reserved lands.

---

[5] Additionally, in 2021, Senator Black introduced L.D. 471, which would require that transmission line projects on public reserved lands be approved by a supermajority of the Legislature and states that the construction of transmission lines constitutes a substantial alteration under Article IX, Section 23. Moreover, it would make these amendments retroactive to September 16, 2014 (it appears that L.D. 471 was carried over to a subsequent session). Similar legislation is the subject of a citizen's ballot initiative, which was certified by the Maine Secretary of State in February 2021. The Governor issued a proclamation requiring that a referendum on the initiated bill be submitted to the voters on November 2, 2021. *Caiazzo v. Secretary of State*, 2021 ME 42, ¶ 5, – A.3d –.

[6] As part of an effort to explain the change in the lease's title, outside counsel for BPL stated in an email:

> With input from Andy Cutko, we've characterized this as an "Amended and Restated Lease," and added a provision … that specifies this Amended and Restated Lease expressly supersedes the 2014 Lease. (As opposed to just signing a new Lease and signing a separate agreement to terminate the 2014 Lease.) Idea is to help show that this 2020 Lease does nothing to "substantially alter" the leased premises now, while still providing a new lease agreement that is being executed after the 2019 CPCN.

R. V0117.

As was the case with the 2014 lease, BPL did not provide notice to the Legislature or the public before signing the lease, and it did not seek or obtain 2/3 legislative approval of the 2020 lease. Nor did it make any contemporaneous written findings as to why it did not seek such approval.

## Procedural History

On June 23, 2020—the day the 2020 lease was executed —Plaintiffs filed a Complaint challenging the 2014 lease.[7] At some point after the lawsuit was filed, AAG Parker informed Plaintiffs that CMP and BPL had entered into a new lease. So, on July 17, 2020, Plaintiffs amended their complaint to challenge both the 2014 and 2020 leases. The Amended Complaint alleges, among other things, that the execution of the leases was *ultra vires*, asserting that BPL did not obtain approval of the leases by a supermajority of the Legislature as required by Article IX, Section 23 of the Maine Constitution and that the 2014 lease was signed before the issuance of a CPCN. It alleged three counts: Declaratory Judgment (Count I), Injunctive Relief (Count II), and, in the alternative, Review of Final Agency Action under the Maine Administrative Procedures Act ("MAPA") and Rule 80C of the Maine Rules of Civil Procedure (Count III).

BPL and CMP subsequently moved to dismiss the Declaratory Judgment and Injunctive Relief counts, arguing that the action should proceed only as an administrative appeal under Rule 80C and MAPA.[8] BPL filed the administrative record while these motions were pending and the Court invited supplemental briefing thereafter. On December 21, 2020, the Court denied BPL

---

[7] The day after Plaintiffs filed their lawsuit, outside counsel for BPL circulated an email indicating that the lawsuit had been filed, but "[f]ortuitously the State had already signed the new lease." Pls.' R. Add. 303.

[8] CMP also raised a standing-based challenge which Director Cutko did not join. The Court issued a decision regarding CMP's standing argument on October 30, 2020 and concluded that at least some of the named Plaintiffs have standing.

9

and CMP's motions and permitted the case to proceed in Count I as a declaratory judgment action (with some limitations) and as a Rule 80C action in Count III.[9]

Following briefing by the parties, the Court next addressed a legal issue that was potentially dispositive of the case: Whether leases of public reserved lands issued pursuant to 12 M.R.S.A. Section 1852(4) are exempt from Article IX, Section 23. In an order dated March 17, 2021, the Court concluded that leases under Section 1852(4) are not categorically exempt from the application of this constitutional provision or 12 M.R.S.A. §§ 598–598-B. The Court also concluded that the Legislature had entrusted to BPL the obligation of making a determination in the first instance regarding whether a proposed action on public reserved land would reduce or substantially alter the uses for which the State holds that land in trust for the public. The Court first concluded that the language in both the Constitution and enabling statute is clear. Second, the people of Maine through the Amendment retracted authority previously delegated to the Executive Branch by the Legislature. Third, the Legislature's unique constitutional prerogative to have final say over how public lands are used in certain instances cannot be effectuated—and could be undermined or thwarted—unless BPL determines at the outset whether a proposed use of designated public lands results in a "substantial alteration" as defined by the Legislature; and importantly, that these steps must take place publicly, and before any lease is executed.

After deciding these legal questions, various record-related issues remained unresolved, so the Court addressed the scope of the record in an order dated April 21, 2021. The Record was compiled over the course of several months, in part because Plaintiffs have made a broad Freedom of Access request and the materials have been provided by BPL in different batches,

---

[9] The Court concluded that Plaintiffs' claim for injunctive relief under Count II was remedial and potentially duplicative and thus deferred ruling on it until after the Court decided Plaintiffs' claim under Rule 80C.

and were actually still being provided during final briefing on the merits. In the April 21, 2021 order, the Court struck from the administrative record a September 2020 BPL-prepared memorandum—authored after both leases were signed and while this case was under active litigation—on the grounds that it was an impermissible post-hoc justification of the actions it had taken with respect to the 2014 and 2020 leases. Additionally, the Court ruled on various proposed modifications and corrections to the record and reiterated the proper scope of the Declaratory Judgment count.

Subsequently, CMP and BPL appealed the Court's orders, but the Law Court dismissed the appeals as untimely and/or interlocutory. Briefing on the merits of the Rule 80C claim followed, and all parties moved for judgment on Plaintiffs' Declaratory Judgment claim. The Court held oral argument in this matter on July 16, 2021.

DISCUSSION

A. Count I—Declaratory Judgment

14 M.R.S.A. Section 5953 provides this Court with jurisdiction to "declare rights, status and other legal relations" between the parties. While Defendants have argued that no declaratory judgment can be issued by the Court as to the 2014 lease, and that the Court only has jurisdiction over the 2020 lease pursuant to MAPA, the Court previously rejected these arguments, but limited the scope of what Plaintiffs could argue in this Count. Specifically, the Court ruled that Plaintiffs could assert as part of their Declaratory Judgment action that BPL's decision to enter into the leases was *ultra vires* and could argue, among other things, that BPL failed to provide as to either lease any meaningful, public administrative process prior to executing the leases.[10]

_____

[10] Plaintiffs also argue that BPL lacked authority to enter into the leases because the 2014 lease was executed prior to the issuance of a CPCN and legislative approval of the leases was constitutionally

11

As noted previously, the Court has concluded that BPL must make a determination as to whether a proposed use of public lands would reduce or substantially alter the uses of those lands and must do so *before* the use is "substantially altered." This is not just a regulatory or statutory requirement. It is required by the plain language of Article IX, Section 23's mandate that a supermajority of the Legislature must approve reductions and substantial alterations to the uses of designated lands. Furthermore, the applicable statutory framework—which entrusts BPL with the care and management of public reserved lands and provides BPL with a statutory definition of "substantial alteration" —confirms the Court's interpretation on this point. As the Court has noted on prior occasions, it is difficult to understand what the definition is otherwise for. Its existence can only legally be understood as comprising part of the post-Amendment delegation of authority to BPL by the Maine Legislature.

Having summarized its prior legal conclusions, the Court turns to the arguments made in the parties' merits briefing regarding both leases in order to address the "rights, status and other legal relations" of the parties. 14 M.R.S.A. § 5953. More specifically, the Court will be focusing on what the Maine Constitution and the enabling statutes required BPL to do and decide before entering into these leases. The Court will first have to address the issue of mootness raised by the Defendants.

### 1. *Plaintiffs' challenge to the 2014 lease is justiciable.*

Plaintiffs' Declaratory Judgment claim as it pertains to the 2014 lease is not moot, or alternatively, it is amenable to at least one of the mootness exceptions. Defendants argue that BPL and CMP's execution of the 2020 lease terminated the 2014 lease and thus mooted all of

---

required as a matter of law. The Court need not address these contentions in light of its disposition of this Count below.

12

Plaintiffs' claims as to the 2014 lease. They say that the 2020 lease—not the 2014 lease—governs the contractual relationship between BPL and CMP and defines their legal rights with respect to the leased property.

The Court nevertheless concludes that sufficient practical effects flow from the resolution of Plaintiffs' issues surrounding the 2014 lease to justify a decision by the Court. *Campaign for Sensible Transp. v. Me. Tpk. Auth.*, 658 A.2d 213, 215 (Me. 1995) (explaining that "[t]he test for mootness is whether 'sufficient practical effects [flow] from the resolution of [the] litigation to justify the application of limited judicial resources.'"). As Plaintiffs point out, the 2014 lease was the predicate for the 2020 lease and the two leases are inextricably linked such that the Court's legal rulings on the 2014 lease affect its rulings on the 2020 lease.

BPL, for instance, relies upon its pre-2014 lease conduct to support its contention that it made the constitutionally required substantial alteration decision before entering into the 2014 lease. It then uses the actions in 2014 as a basis for asserting that it made the requisite constitutional determination prior to entering into the 2020 lease. Similarly, BPL and CMP further argue that the pre-2020 lease management plan process, during which the already-executed 2014 lease was mentioned, constituted a public process sufficient to satisfy the requirements of Maine law. The Court's evaluation of such an argument must take into account the adequacy of the process associated with the 2014 lease. The issues surrounding the 2014 and 2020 leases simply cannot be disentangled.

In any event, Plaintiffs' challenge to the 2014 lease may be considered because the "public interest" and "capable of repetition but evading review" exceptions to the mootness doctrine apply. *A.I. v. State*, 2020 ME 6, ¶ 9, 223 A.3d 910 (setting forth the exceptions to the mootness doctrine). First, with respect to the public interest exception, a court may consider an

13

issue despite its mootness if it involves "questions of great public concern that, in the interest of providing future guidance to the bar and public [the Court] may address." *Id.* "In deciding whether an issue meets the public interest exception, [courts] consider the following criteria: whether the question is public or private, how much court officials need an authoritative determination for future rulings, and how likely the question is to recur in the future." *Mainers for Fair Bear Hunting v. Dep't of Inland Fisheries & Wildlife*, 2016 ME 57, ¶ 8, 136 A.3d 714, 717 (internal quotation marks omitted).

The Court is satisfied that the public interest exception is applicable here. The questions surrounding the 2014 lease are plainly public in nature and address BPL's authority to lease land that is held in trust for the public. The two referenda related to the Corridor, along with public proceedings challenging the project in multiple forums, reveal that the public's interest in the lease is strong and ongoing. Moreover, the 2014 lease involves various issues of first impression for which authoritative guidance is needed by the agency and the courts. While BPL asserts that the Court can provide this guidance through its adjudication of the 2020 lease, the issues surrounding the 2014 and 2020 leases do not fully overlap. For instance, unlike the 2020 lease, the 2014 lease did not become public in time for Plaintiffs to seek judicial review under Rule 80C, raising an important question about BPL's leasing process, i.e., whether BPL was obligated to make its determinations public so that Plaintiffs could seek judicial review. As far as the record reveals, BPL has yet to adopt any recognizable administrative process that would enable judicial review of BPL's leasing-related decisions, which suggests that the issue is likely to arise again and authoritative guidance would be useful.

Second, the Court finds that the issues surrounding the 2014 lease fall under the mootness exception for issues that "are capable of repetition but evade review because of their

14

fleeting or indeterminate nature." *A.I.*, 2020 ME 6, ¶ 9, 223 A.3d 910. BPL, under two different administrations, has taken positions that convince the Court that the issues related to the 2014 lease will recur. BPL has also asserted alternative—and sometimes inconsistent—arguments. BPL has at times asserted that it was not required to make a reduction/substantial alteration determination before either lease was executed. It has also asserted that it actually did make such a determination which could simply be "inferred" by the execution of the leases and/or by the existence of a management plan that was finalized in 2019. It has asserted that the determination did not need to be memorialized in writing or be made public before the leases were signed. Additionally, it has asserted that utility leases are categorically exempt from the requirements of Article IX, Section 23 and that the passage of the Amendment did not affect BPL's ability to convey 25-year leases for transmission lines and a whole host of other projects including pipelines and landing strips. And BPL asserted that it has no obligation to keep the public or Legislature informed of its decisions on a timeline that would make judicial review possible, although AAG Parker did inform Plaintiffs' counsel of the existence of the 2020 lease after the fact, and after they had filed this litigation on June 23, 2020. BPL's position on the latter particularly underscores how the issues associated with the 2014 lease tend to evade review: if BPL's leasing decisions are not transparently made or publicly declared until after the expiration of the period for filing a rule 80C appeal, the opportunities for judicial review diminish. Moreover, as noted, there are issues unique to the 2014 lease that the Court's adjudication of the 2020 lease would not encompass. Accordingly, the Court is not persuaded that the "capable of repetition but evading review" exception is inapplicable under these circumstances.

Thus, the Court concludes that the 2014 lease is justiciable and addresses it as part of Plaintiffs' Declaratory Judgment claim.

15

**2. *BPL must apply the definitions set forth in 12 M.R.S.A. Section 598 when deciding whether a proposed lease reduces or substantially alters the uses of the public reserved lands at issue.***

Again, the starting point for the Court's discussion must be Article IX, Section 23 of the Maine Constitution:

> State park land, public lots or other real estate held by the State for conservation or recreation purposes and designated by legislation implementing this section may not be reduced or its uses substantially altered except on the vote of 2/3 of all the members elected to each House. The proceeds from the sale of such land must be used to purchase additional real estate in the same county for the same purposes.

Me. Const. art. IX, § 23.

The Legislature in 12 M.R.S.A. Sections 598–598-B enacted implementing legislation to give effect to this constitutional provision. As relevant here, the Legislature defined the term "reduced" to mean "a reduction in the acreage of an individual parcel or lot of designated land under section 598-A." 12 M.R.S.A. § 598(4). Meanwhile, "substantially altered" means "changed so as to significantly alter physical characteristics in a way that frustrates the essential purposes for which that land is held by the State." 12 M.R.S.A. § 598(5).

As the Court explained in its March 17, 2021 order, the statutory definition of "substantial alteration" involves two aspects: whether the use significantly alters the land's physical characteristics, and whether the alterations "frustrate" the essential purposes for which the land is held. As to the later, "the essential purposes for which [] land is held by the State" can be found in both the Maine Constitution and in the definition provided by the Legislature.

It must be underscored that Article IX, Section 23 directly speaks to the matter of "essential purposes." The Amendment applies by its terms to lands "[1] *held by the State for conservation or recreation purposes* and [2] designated by legislation implementing this section." Me. Const. art. IX, § 23 (emphasis added). Without question then, the Maine

16

Constitution establishes that conservation and/or recreation are as a fundamental matter the "essential purposes" for which the land in question is held by the State.

The Legislature also has defined the essential purposes of public reserved lands: "The essential purposes of public reserved and non-reserved lands are the protection, management and improvement of these properties for the multiple use objectives established in section 1847." 12 M.R.S.A. § 598(5). While "multiple use" is defined in other provisions, the Legislature has specifically defined "essential proposes" with reference to the "multiple use objectives" set forth in 12 M.R.S.A. Section 1847. Specifically, subsection 1847(1) states:

> **1. Purpose**. The Legislature declares that it is in the public interest and for the general benefit of the people of this State . . . that the public reserved lands be managed under the principles of multiple use [1] to produce a sustained yield of products and services by the use of prudent business practices and the principles of sound planning and that the public reserved lands be managed [2] to demonstrate exemplary land management practices, including silvicultural, wildlife and recreation management practices, as a demonstration of state policies governing management of forested and related types of lands.

12 M.R.S.A. § 1847(1).

Given these legislative definitions of "reduction" and "substantial alteration," it is clear to the Court that BPL must make the reduction/substantial alteration determination contemplated in Article IX, Section 23 by applying those statutory definitions set forth by the Legislature. BPL argues that its "management plans" are a sufficient substitute for these statutory definitions but the Court is not persuaded. BPL's execution of a management plan is not a substitute for application of definitions legislatively mandated. In addition, the Court would note that there was no management plan in effect when the 2014 lease was issued. Thus, the management plan process could not possibly have been the basis for any finding that the 2014 lease did not reduce or substantially alter the public reserved lands at issue.

Moreover, with respect to the 2020 lease, the management plan finalized in June of 2019—which makes no mention of the statutory definitions of reduction or substantial alteration—did not relieve BPL of its obligation to make the reduction and substantial alteration determination in accordance with the statute. The analysis associated with the management plan is fundamentally different from the analysis BPL must undertake when applying the statutory definition. For instance, the dominant and secondary uses that BPL assigns to the land in its management plan are not the same "uses" against which the statute measures "substantial alteration." The agency-assigned dominant and secondary uses are not objectives in themselves, *see* 12 M.R.S.A. §§ 598(5), 1847(1), although arguably they could be said to represent part of BPL's plan to meet its objectives. A lease under 12 M.R.S.A. Section 1852(4), although perhaps consistent with BPL's plan, could nevertheless frustrate the essential purposes for which the land is held by the State. Additionally, the management plans are by definition geared toward "management." The statutory definition, however, requires BPL to look beyond its management objectives and analyze whether the proposed lease frustrates the *protection* and *improvement* of the property for the multiple use objectives established in Section 1847(1). 12 M.R.S.A. § 598(5).

The Court therefore concludes that BPL must make the determination required by Article IX, Section 23 by applying the specific statutory definitions set forth in 12 M.R.S.A. Section 598. BPL has no authority to ignore or re-write a statute of the Legislature, particularly one with such a clear constitutional foundation.

3. ***The reduction/substantial alteration determination must be made public and be made as part of a public administrative process before BPL decides to enter the lease and before it conveys any property interest in the public lands.***

Before it decides to enter and before it executes a lease under 12 M.R.S. Section 1852(4), the Court has found that BPL must make a reduction/substantial alteration determination. The

18

Court has also concluded that the Maine Constitution requires that any such determination must be made pursuant to a public administrative process.

It is axiomatic in Maine that administrative processes must be public processes, unless the Legislature provides otherwise. Neither Defendant seems to contest this basic premise, nor have they pointed to any legislative exemption made for BPL to do otherwise. And given the subject matter at issue here —constitutionally protected public lands — the need for transparency and public process is heightened. Indeed, the West Forks and Johnson Mountain public reserved lands are not just public lands, they are *public trust* lands. 12 M.R.S.A. § 1846(1).

While the traditional notion of the public trust has generally included sovereign waters and submerged lands, the Legislature has recognized that public reserved lands are natural resources valuable enough to be held in trust for the public's continued access and reasonable use. *See id.* Moreover, the Legislature has assigned BPL the important role of trustee of those lands, providing in Section 1847 that "title, possession and the responsibility for the management of the public reserved lands be vested and established in the bureau acting on behalf of the people of the State." 12 M.R.S.A. § 1847(1).

These provisions make clear that BPL as public trustee is ultimately accountable to the citizens of Maine. Thus, as one court put it in a similar context, a public trustee "as the primary guardian of public rights under the trust, must take the initiative in considering, protecting, and advancing public rights in the resource at every stage of the planning and decision-making process." *In re Wai'ola O Moloka'i, Inc.,* 83 P.3d 664, 693 (Haw. 2004) (quotation marks omitted). "[T]he state may compromise public rights in the resource pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority

19

these rights command." *Id.*; *see also Kootenai Envtl. All. v. Panhandle Yacht Club*, 671 P.2d 1085, 1091 (Idaho 1983) ("public trust resources may only be alienated or impaired through open and visible actions, where the public is *in fact* informed of the proposed action and has substantial opportunity to respond to the proposed action before a final decision is made thereon" (emphasis original)). BPL's reduction/substantial alteration decision—which ultimately may determine whether public trust lands are leased to private entities for uses like setting power lines, building landing strips, or pipelines—is the type of critical decision that BPL must make openly and through an administrative process that reflects the public's important interests under the trust. BPL's duty as trustee to act on the people's behalf requires no less.

Additionally, the process-related requirements set forth above arise by implication from Article IX, Section 23. Defendants challenge the notion that there is a constitutional basis for requiring any additional public process. In doing so, they focus their argument on the federal Due Process Clause, maintaining that Plaintiffs lack any constitutionally cognizable property interest in the public reserved lands at issue. However, it is not a federal right that is at issue here, but one that arises from our State Constitution. Article IX, Section 23 does not require satisfaction of the traditional procedural due process test. Rather, Article IX, Section 23 provides a separate source for mandating additional procedural protections[11] and the Court has concluded

---

[11] The Massachusetts Constitution contains a relatively similar provision, which provides in part that:

> [T]he protection of the people in their right to the conservation, development and utilization of agricultural, mineral, forest, water, air and other natural resources is hereby declared to be a public purpose.
>
> …
>
> Lands and easements taken or acquired for such purposes shall not be used for other purposes or otherwise disposed of except by laws enacted by a two thirds vote, taken by yeas and nays, of each branch of the general court.

Mass. Const. amend. art. 97. Additionally, the notion that the state cannot transfer land from one public use to another in the absence of explicit legislative authority appears to have roots in Massachusetts

20

that a public administrative process consistent with the requirements of the Maine Administrative Procedures Act is constitutionally required. *And see,* 5 M.R.S.A. § 9051-A(1)–(2).

4. ***BPL's public reduction/substantial alteration determination must be done in such a way as to permit the Legislature to carry out its duty under Article IX, Section 23 and to permit judicial review.***

Any reduction/substantial alteration determination must be made under circumstances that allow the Legislature to exercise its constitutional prerogative to have the final say in cases where a reduction or substantial alteration is found. Not only does this mean that BPL's determination must be public, as described above, but it also means as noted previously that the determination must be announced before BPL executes a lease that would cause a substantial alteration.

Additionally, the public determination must be issued so as to allow any citizen of Maine (including legislators with standing) to obtain judicial review of decisions in which no reduction or substantial alteration is found. Indeed, the availability of judicial review safeguards the Legislature's constitutional role. Only through judicial review can members of the public remedy mistaken reduction/substantial alteration determinations regarding proposed projects that, but for

---

common law. *Smith v. City of Westfield*, 82 N.E.3d 390, 399–401 (Mass. 2017); *Mahajan v. Dep't of Envtl. Prot.*, 984 N.E.2d 821, 830–31 (Mass. 2013); *Op. of Justices to Senate*, 424 N.E.2d 1092, 1100 (Mass. 1981); *Gould v. Greylock Reservation Com.*, 215 N.E.2d 114, 121 (Mass. 1966).

BPL's mistakes, should have been sent to the Legislature for a vote as required by the Constitution.

Widely available judicial review also fits within the very notions of a public trust:

Judicial review of public trust dispensions complements the concept of a public trust. . . . The duties imposed upon the state are the duties of a trustee and not simply the duties of a good business manager. Just as private trustees are judicially accountable to their beneficiaries for dispositions of the res, so the legislative and executive branches are judicially accountable for the dispositions of the public trust. The beneficiaries of the public trust are not just present generations but those to come. The check and balance of judicial review provides a level of protection against improvident dissipation of an irreplaceable res.

*In re Wai'ola O Moloka'i*, 83 P.3d at 684-85 (citations and internal quotation marks omitted).

Thus, judicial review in this context safeguards the Legislature's constitutional role as well as the public trust itself.

5. ***If the requirements set forth above are not fulfilled, Article IX, Section 23 would effectively be a nullity and the Legislature's constitutional prerogative—in addition to the public trust—would be thwarted or undermined.***

The Court has concluded that if the above-described public procedures are not required, Article IX, Section 23 would be hollow and the Legislature's ability to discharge its constitutional duty would be undermined or thwarted.

Similarly, the above requirements are necessary to protect the legislatively-created public trust against actions that may undermine it. Not only do these requirements guard against improvident dispositions of public trust lands, they also encourage transparency and accountability to the people of Maine, the ultimate beneficiaries of the trust. Furthermore, they make sure that any reductions or substantial alterations to public trust lands are attributable to the decisions of the Legislature which is what this unique Amendment requires.

Thus, in light of these constitutional and statutory requirements, the Court concludes and declares the rights of the parties as follows as to both the 2014 and 2020 leases. In order to have

22

authority to execute a lease of these public trust lands, the BPL Director who signed the lease was required prior to deciding to enter into the lease and prior to executing it, to provide a public administrative process, and make a public, pre-execution determination as to whether the lease would result in a reduction or substantial alteration of the uses of the public land. BPL was also required to use the definitions of reduction/substantial alteration established by the Legislature. In addition, the decision had to have been made in such a way that permitted any member of the public or a legislator with standing to be able to exercise their rights to judicial review of the decision.

**Remedies for Count I**

Based upon the legal arguments made by the parties as to both leases in Count I, the Court has concluded that Plaintiffs are correct as to what BPL is required to decide and steps it must take before its Director had the legal and constitutional authority to enter into these leases. That declaration, however, will be the only remedy provided on Count I for the following reasons.

First, with respect to the 2014 lease, the Defendants have stated at various times in this litigation, that the lease is no longer in effect. This was of course part of their argument as to why they claim Count I is moot, but as noted above, that is not the only factor the Court must consider in a mootness analysis. However, their concession that the 2014 lease is effectively void does affect the remedy that the Court should consider on this Count. Under these circumstances, the only remedy provided will be the declaration above as to what the parties' rights and obligations were as to that lease.

With respect to the 2020 lease, Plaintiffs were able to timely file an appeal under the Maine Administrative Procedure Act in Count III as an alternative to the Declaratory Judgment

23

claim in Count I. Given the Court's analysis below as to merits of that claim, as well as the remedy provided, the only remedy as to the 2020 lease will be the declaration made above. The Court concludes that any other remedy would be duplicative of the remedy provided on Count III.

## B. Count III—Review of Final Agency Action

Plaintiffs have filed a Rule 80C appeal challenging BPL's decision to enter into and execute the 2020 lease. While both Defendants have consistently argued that the Court lacks authority to review the 2014 lease pursuant to a Declaratory Judgment, but did concede the Court has authority to review the 2020 lease pursuant to the Maine Administrative Procedure Act.

As part of their administrative appeal, Plaintiffs allege that (1) there is no competent evidence in the record to show that BPL made the requisite findings and determination regarding whether the lease reduces or substantially alters the uses of the public lands at issue; (2) there is no competent evidence supporting BPL's contention that the lease does not substantially alter the subject lands; and (3) BPL lacked authority to enter into the leases without 2/3 legislative approval as required by 12 M.R.S.A. Section 598-A and Article IX, Section 23. The Court addresses Plaintiffs' Rule 80C challenge below.

As noted above, the Court's consideration of Plaintiffs' Rule 80C appeal is informed by the constitutional and statutory arguments made by the parties with respect to the Declaratory Judgment claim in Count I. The Court now incorporates by reference the legal conclusions made as the starting point for its analysis on Count III. *See supra* discussion of Count I. Accordingly, the legal conclusions made and legal analysis conducted under the Declaratory Judgment claim above apply with equal force with respect to the 2020 lease for purposes of Plaintiffs' Rule 80C appeal.

As noted previously, BPL took the position, at least at some point during this litigation, that leases such as the ones at issue here are categorically exempt from the requirements of Article IX, Section 23, and thus the agency was not obligated to make a "reduction" or "substantial alteration" determination. The Court rejected that contention in its March 17, 2021 Order. Now, in its merits brief, BPL argues that it actually did consider the substantial alteration issue and determined that the 2020 lease would not substantially alter the uses of these public trust lands.

The Court has reviewed the extensive administrative record. Based upon this review, the Court can find no competent evidence supporting BPL's assertion that it made the requisite public, pre-execution findings that the 2020 lease would not reduce or substantially alter the uses of the lands. Both Defendants ask the Court to "infer" that BPL made these determinations, pointing to BPL's actions in 2014 as well as the management plan process, but the record does not support these assertions.

In 2014, BPL conducted what it terms a "resource-based analysis." Specifically, it conducted a site visit of the subject property, considered the impact of the proposed route on a stream and its trout population and negotiated with CMP to reroute the proposed corridor to avoid a stream crossing. However, none of this constitutes competent evidence from which the Court can infer that the requisite determination was made. A "resource-based analysis" is not the standard called for in Article IX, Section 23 and in 12 M.R.S.A. Section 598. Neither the record nor the briefing discloses whether this "resource-based analysis" was parallel to the constitutional and statutory standards such that they could be considered "coextensive" as BPL asserts. Consideration by BPL of some degree of environmental impact does not permit such an inference. The Constitution demands answers to different questions: namely, would the project

25

result in a reduction or substantial alteration of the uses of these public trust lands? And it further requires, for reasons set out above, that a public process for answering these questions be employed by BPL before the lease is executed. While judicial review of the 2020 lease was made possible given AAG Parker's belated disclosure of the lease, there is no competent evidence in the record to support any assertion that BPL—prior to deciding to enter into the lease and prior to executing the lease—made the requisite finding as to whether the 2020 lease would reduce or substantially alter the uses of the subject lands, and certainly not one using the controlling statutory definitions.

Defendants largely rely upon the management plan finalized in 2019 to support their assertion that the proper determination was made. But as discussed previously, designing and implementing a management plan is not the same as making a public, pre-lease determination that the lease would not frustrate the essential purposes as articulated in the Maine Constitution and as defined by the Maine Legislature.

In the absence of any such competent evidence that these constitutional and statutory requirements were fulfilled, the Court concludes that BPL Director Cutko lacked authority to enter into the 2020 lease.

Because the Court has determined that BPL lacked authority to enter into the 2020 lease, the Court will not consider the other arguments made by Plaintiffs as to this lease.

**Remedies for Count III**

Plaintiffs have throughout this litigation asked that this Court make the determination of whether the leases in question constitute a "reduction" or "substantial alteration" of these public trust lands, and they still seek this as part of the remedy requested. The Court has consistently declined to act as the fact-finder in this case, as it does not believe that is what the Legislature

26

intended when it enacted the enabling legislation that not only delegated management authority to BPL, but also gave the agency definitions to apply in making these important determinations.

Plaintiffs have also pointed to certain actions taken within the last two years by the Legislature which without question express a desire on the part of a significant number of its members to deem this project to be a substantial alteration in uses. The Plaintiffs seem to suggest that these actions or expressions by the Legislature support their position that the Court should also find that a "substantial alteration" will occur if the construction on the public lands goes forward. However, the Court agrees with the Defendants on this point generally, and specifically with respect to a recent Proclamation of the Maine Legislature issued on July 19, 2021. The Court has no authority to consider these actions as they did not effectively change the law that is in effect now. The Court's job is to do its best to construe laws after they are finally enacted either by the Legislature and approved by the Governor; or enacted by the people of Maine.

As the multiple and difficult issues of first impression presented in this matter have been litigated and decided, the proper role of the Superior Court and the doctrine of separation of powers have loomed large. However, what has been clear to the Court since the beginning of this case is this: after the people of Maine ratified Article IX Section 23, the Maine Legislature entrusted the management of this public trust to BPL, and it provided BPL with definitions to use when deciding in the first instance whether a "reduction" or "substantial alteration" in use might occur with respect to these lands.

The Court has now concluded that there is no competent evidence in the record to support BPL's assertion that it made these determinations, and that Director Cutko therefore lacked authority to enter into the 2020 lease. The next issue is what remedy the Court has the authority to provide under these circumstances.

For their part, Defendants argue that should the Court find that no competent evidence supports its assertions, the Court should simply remand the case to BPL to make the determinations now, but that it should not vacate the lease. The Defendants argue that vacating the lease will cause disruption to other litigation in which they are involved and to their construction plans on the public lands. Plaintiffs argue that if the Director had no authority to sign the lease it must be vacated. Importantly, the parties cannot agree on what kind of a public process is required if the Court were to simply remand. Again, there is an apparent dearth of cases in Maine addressing what remedies are appropriate under such circumstances, and the parties have once again directed the Court to federal law.

The Court has reviewed the cases proffered by the parties and finds the cases cited by Plaintiffs to be the most applicable, as they provide guidance regarding what courts should do when agencies bypass fundamental procedural steps in reaching an ultimate decision. *See Standing Rock Sioux Tribe v. U.S. Army Corp of Engineers,* 985 F.3d 1032, 1051–54 (D.C. Cir. 2021). This is not a situation where an agency failed to take an important step in a public administrative process. In this case, BPL provided no public administrative process at all prior to deciding to enter into the 2020 lease. Article IX, Section 23 and the Maine Legislature's designation of these lands as public trust lands make these shortcomings very fundamental. The Court therefore declines to order remand without vacatur as requested. BPL exceeded its authority when it entered into the 2020 lease with CMP, and BPL's decision to do so is reversed.

To be clear, the Court has not changed its mind about the need for BPL to be the forum where the determinations of "reduction" or "substantial alteration" are to be made in the first instance.  Unless and until a different law is finally enacted which changes this current

28

delegation to the agency—which could still perhaps occur depending on the final outcome of the November 2021 referendum—those determinations must be made by BPL.

At the same time, the Court is not permitted as a matter of separation of powers to create such a process for the agency; it can only find, as it has, that a public process was required given this unique Constitutional Amendment and the enabling statute enacted by the Legislature. A "simple remand" would be anything but simple. No recognizable process currently exists and the parties could spend many months litigating in multiple forums how much process is required. The Court is convinced a remand under these circumstances would create its own "disruption."

There is one issue upon which the parties agree, and that is that this Decision and Order will be followed by appeals and cross appeals. The legal and constitutional questions presented by this case can therefore be presented to the Law Court for resolution, as it sees fit, before BPL can know what is or is not legally required of it both as to law and to process, should the case be remanded to it once the appeals are concluded.

CONCLUSION

The entry will be: As to the Declaratory Judgment claim in Count I, the Court grants Plaintiffs' Motion for Judgment, and has issued a declaration on the rights and obligations of the parties above, for the reasons stated. The Court denies Director Cutko and BPL's Motion to Dismiss Count I and CMP's Motion for Judgment on Count I. As to Count II's claim for Injunctive Relief, the Court finds that this form of relief was not pursued in the merits briefing or oral argument and is therefore waived. As to Plaintiffs' Appeal of Final Agency Action in Count III, the Court finds no competent evidence to support BPL's claim that it made the constitutionally-required finding of no "reduction" and/or no "substantial alteration" before it

29

entered into the 2020 lease with CMP. Director Cutko therefore exceeded his authority, and his decision is therefore reversed.

This Decision and Order may be noted on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

8/10/2021

_____
**DATE**

_____
**SUPERIOR COURT JUSTICE**

Entered on the docket:  08/10/2021

30

STATE OF MAINE
CUMBERLAND, ss.

BUSINESS AND CONSUMER DOCKET
Location: Portland
DKT. NO. BCDWB-CV-2020-29

RUSSELL BLACK, *et al.*,

    Plaintiffs,

v.

ANDY CUTKO, *et al.*

    Defendants.

)
)
)
)
)
)
)
)
)
)
)

**ORDER REGARDING THE
DECLARATORY JUDGMENT
RECORD AND 80C RECORD**

Plaintiffs in this action challenge the Bureau of Parks and Lands' ("BPL") 2014 and 2020 decisions to lease to Central Maine Power Company[1] ("CMP") portions of two parcels of public reserved land in Somerset County to construct part of the New England Clean Energy Connect transmission corridor. The Court has issued a number of procedural and substantive orders in this case. This Order determines the factual record upon which the Court will rely for purposes of the Rule 80C appeal and addresses the Plaintiffs' request for development of a factual record in the Declaratory Judgment count. Before addressing those issues, a brief review of how the case has reached this point is in order.

On December 21, 2020, the Court denied motions to dismiss filed by BPL and CMP and permitted this case to proceed in Count I as a declaratory judgment action (with some limitations) and as a Rule 80C action in Count III. At the direction of the Court, Plaintiffs filed an all-encompassing motion regarding the state of the record on January 7, 2021. In that motion Plaintiffs sought to strike from the record as an impermissible post hoc justification a September 24, 2020 memo to the "Public Lands Lease Files" authored by BPL Director Andy Cutko and Director of

---

[1] CMP assigned the 2020 lease to NECEC Transmission LLC in early 2021. NECEC Transmission was joined as a defendant in this case. The Court will refer to them collectively as CMP for the sake of consistency with prior orders in the case.

1

Real Property Management David Rodrigues. Plaintiffs also sought to add additional documents to the record. BPL and CMP each opposed Plaintiffs' motion on January 15, 2021. The Court viewed an issue highlighted by BPL in its opposition as potentially dispositive of the case and ordered the parties to brief that legal issue.[2]

On March 17, 2021, the Court issued an order on that legal question. It concluded that leases pursuant to 12 M.R.S. § 1852(4) were not categorically exempt from application of Article IX, Section 23 of the Maine Constitution and 12 M.R.S. §§ 598-598-B. The Court also concluded that the Legislature had entrusted to BPL the obligation of making a determination in the first instance whether a proposed action on public reserved land would reduce or substantially alter the uses for which the State holds that public reserved land in trust for the public. That decision was grounded in two conclusions. First, the Court concluded that the language in the Constitution and enabling statute is clear. Second, and no less important, the Legislature's unique constitutional prerogative to have final say over how public lands are used in certain instances does not and cannot be effectuated unless a decision is made – one way or the other – by BPL as to whether a proposed use of designated public lands results in "substantial alteration" as defined by the Legislature.

Following that decision the Court held a conference with counsel on March 24, 2021, and ordered the parties to file by April 2, 2021, their positions supplementing arguments regarding the record and to restate proposed remedies. After reviewing those filings, the Court determined it was necessary to issue an order regarding the state of the record before proceeding to the next stage in this case. This prompted the Court to have another conference with the parties on April 9. Plaintiffs requested an opportunity to object to two documents BPL sought to add to the record as

---

[2] Deadlines regarding the record were stayed while the Court addressed the legal issue.

2

overlooked. Thus, the Court gave Plaintiffs until April 12 to file a brief objection, BPL and CMP until April 14 to respond to the brief objection, and Plaintiffs until April 14 to seek to add anything else to the record that might come across their radar by way of Freedom of Access Act responses from BPL in the interim. After consideration of all filings regarding the state of the record, the Court issues this order.

**ANALYSIS**

The Court will first address the issues for the record in the Rule 80C appeal and it will then address the issues for the record in the Declaratory Judgment count.

## I. THE RULE 80C APPEAL RECORD

1. <u>The issues in the Rule 80C appeal.</u>

From the beginning of this case, BPL and CMP have argued that this is at most a Rule 80C appeal from a final agency action. They claim that the final agency actions are the two leases to CMP to use portions of public reserved land in Johnson Mountain Township and West Forks Plantation.[3] For purposes of ruling on the Rule 80C record, after considering the pleadings and arguments made to this point, the Court can identify four issues it will be asked to decide:[4]

- Whether there is competent evidence in the record to support BPL's contention that a determination regarding substantial alteration was made prior to entering into the leases;

- Whether there is competent evidence in the record to support BPL's contention that the leases to CMP of Johnson Mountain Township and West Forks Plantation do not

---

[3] Both BPL and CMP filed motions to dismiss as noted. The Bureau did not move for dismissal of the Rule 80C appeal, but CMP has maintained that Plaintiffs do not have standing.

[4] The Court does not intend to suggest that the parties cannot make arguments on issues other than those listed; the parties are certainly free to argue the issues as they see them. In addition, the Court's characterization of the issues does not discuss, for purposes of this Order, burdens of proof or the Court's standard of review. All of those issues can be fleshed out by the parties in merits briefing.

substantially alter the uses for which the State holds the land;

- Whether BPL entered into the leases without the necessary authority to do so; and

- Whether BPL's decisions to enter into the leases violated Article IX, Section 23 of the Maine Constitution.

The above issues will therefore be the starting point for consideration of the parties' arguments as to what should or should not be included in the record. *Cf. FPL Energy Hydro Maine, LLC v. Bd. of Envtl. Prot.*, No. AP-08-15, 2009 Me. Super. LEXIS 53, at \*2 (Feb. 9, 2009) ("Although it is premature to delve into the merits of the 80C petition at this juncture, some discussion is necessary to understand the context of the proffered evidence to determine whether it should be added to the record."). Plaintiffs have sought to add information to the record they claim supports their contention that BPL never made a determination regarding substantial alteration. BPL has also sought to correct the record to add a few more documents relevant to the decisions to lease.

The parties seem to agree on one central fact: there exists no contemporaneous written decision or written findings of fact applying the standard of substantial alteration that predate BPL's decision to enter into a lease either in 2014 or 2020. Therefore, the Court will have to determine whether the record contains competent evidence that such a determination was nevertheless made, as BPL continues to insist. Thus, it is necessary for the record to include any information BPL relied on prior to its decision to enter into the leases in 2014 and/or 2020, any information that rebuts or contradicts BPL's assertions about the determination process, and any information that supports or contradicts BPL's assertions that it acted properly within its authority when it entered into the leases with CMP.

2. The parties' positions regarding the Rule 80C record.

Plaintiffs seek to exclude BPL's September 24, 2020 memo on the basis that it is an

4

impermissible post hoc justification for BPL's prior actions. They also seek to add twelve specific exhibits to the record and to provide additional testimony from various individuals (such as the testimony of Director Andy Cutko and David Rodrigues). The exhibits Plaintiffs seek to add include the following:

(1)     Assistant Attorney General Lauren Parker's July 25, 2018 memorandum to the BPL Director.

(2)     The April 24, 2020 Authorization for Outside Counsel regarding the authority of attorneys at Verrill to represent BPL.

(3)     The Certificate of Public Convenience and Necessity ("CPCN") issued for the NECEC project.

(4)     The May 2020 Department of Environmental Protection permit for the NECEC.

(5)     L.D. 1893, titled "An Act To Require a Lease of Public Land To Be Based on Reasonable Market Value and To Require Approval of Such Leases for Commercial Purposes," and Amendment A thereto.

(6)     A Bangor Hydro Memorandum of Intent dated March 24, 2005.

(7)     Correspondence from the fall of 2019 between former Deputy Director Alan Stearns and Director Andy Cutko regarding the Bureau's former approach to legislative approval of leases.

(8)     Testimony of BPL Director Andy Cutko and others, including David Rodrigues, both before the Legislature regarding the lease transactions, as well as Director Cutko's testimony as a private citizen before the Department of Environmental Protection regarding the NECEC (before he became the Director of BPL).

(9)     The attachments to Plaintiffs' Complaint, including the press clippings and the

5

summaries of legislative resolves relating to conveyances of public lands.

(10) Legislative Resolves relating to leases and to matters Plaintiffs contend were much less significant in stature than CMP's proposed transmission line.

(11) The Legislature's request for documents and BPL's response thereto in connection with L.D. 1893.

(12) CMP's lease with the Passamaquoddy for lands for the Corridor.

Plaintiffs' April 2 letter seeks to add the following additional information to the record:[5]

(A) L.D. 471 in the current session, which proposes two amendments to 12 M.R.S § 1852(4) in response to BPL's arguments in this case.

(B) The testimony of Director Cutko in opposition to L.D. 471 on March 18, 2021 (available at https://www.youtube.com/watch?v=RbZB3pl-QAU start time 13:08, end time 33:50)

(C) A letter from the Agriculture, Conservation and Forestry ("ACF") Committee dated March 29, 2021, to the Commissioner of the Department of Agriculture, Conservation and Forestry and Director Cutko in response to the Director's testimony.

(D) A BPL-produced video regarding public reserved lands (available at https://www.youtube.com/watch?v=Im-uBEaTtEA).

Further, on April 14, Plaintiffs proposed to add six email chains to the record relating to the 2020 version of the lease. These email chains complete or provide context to email chains that already exist in the record filed by BPL in November 2020 and were just recently obtained – within the past two weeks or so – by Plaintiffs pursuant to a Freedom of Access Act request.

CMP contends the Court should not strike the September 24, 2020 memo from the record

---

[5] Plaintiffs identified the first set of exhibits with numbers in the January 7 filing and with letters in the April 2 filing. The Court is using the numbers and letters identified by Plaintiffs.

6

but, to the extent the Court does so, it should remand this matter to BPL to make a new decision concerning the substantial-alteration-of-use question. CMP also objects to Plaintiffs' proposed exhibits 1-3 and 5-11 being added into the record. Further, CMP contends the Court should not admit proposed exhibits 4 and 12 into the record but should remand to BPL for its determination if the Court finds these documents necessary for consideration; the Court should not admit into the record any of the proposed testimony Plaintiffs outline in their Motion but, to the extent the Court believes this testimony should be considered, the Court should remand the matter to BPL for consideration of it and a renewed decision; and the Court should not require Director Cutko or David Rodrigues to testify or be deposed, and should not hold a de novo hearing. Lastly, CMP objects to adding Director Cutko's March 18, 2021 testimony before the Legislature to the record.

BPL also takes the position that the Court should consider the September 24, 2020 memo as a permissible explication of what is already in the record. If the Court determines the memo is an impermissible post hoc justification, BPL contends the Court must remand the matter to BPL to make a new determination regarding substantial alteration after public notice; acceptance of public comments for fourteen days on the issue of substantial alteration; consider all such evidence received; prepare new written findings; and submit to this Court such material, including the 5 additional documents offered by BPL, as a supplement to the administrative record.[6] The 5 documents offered by BPL as corrections to the record pursuant to 5 M.R.S. § 11006(2) are as follows:

(a)     The Bureau's 1985 Prescription Review and Multiple Use Coordination Report for the 1986-87 commercial timber harvest of the West Forks Plantation public reserved lands.

---

[6] While the parties' arguments regarding the record are tethered to the remedies they are seeking, the Court will as part of this Order provide a briefing schedule to enable them to make any arguments they wish which would include any remedy provided for under the Maine Administrative Procedure Act.

7

(b)      The Bureau's March 2006 Prescription Review and Multiple Use Coordination Report with Harvest Map for the 2006-07 commercial timber harvest of the West Forks Plantation and Johnson Mountain Township public reserved lands.

(c)      Bureau staff notes, dated August 14, 2014, related to CMP's request for a conveyance of a property interest over public reserved lands for an electric power transmission line.

(d)      An internal marked-up copy of the 2014 lease dated September 22, 2014.

(e)      A Department of Administrative and Financial Services, Bureau of General Services, Professional Service Pre-Qualification List identifying Dwyer Associates, which appraised the leased premises, as pre-qualified to provide property appraisal services for state agencies.

In response to BPL's attempted correction of the record, Plaintiffs objected to the two Prescription Review and Multiple Use Coordination Reports noted above on the basis that they "were not considered by the Bureau at the time it allegedly made a substantial alteration determination . . . ." (Pl.s' Obj. p. 2 (Apr. 12, 2021).)

As it pertains to Plaintiffs' proposed exhibits, BPL does not object to 1-3, 5-7, 8 (pages 201-243 only), and 9-11 from the January 7 filing. BPL does object to Plaintiffs' proposed exhibits 4, 8 (pages 1-200), 12, and the six proposed affidavits. In its April 2 filing, BPL stated that,

> [s]hould the Plaintiffs, through their contemporaneous letter to this Court, ask the Court to supplement the administrative record with materials in addition to those identified in Plaintiffs' motion, the Court should deny that request absent confirmation from the Bureau that the Bureau considered same. If, however, the Court determines that any such additional proposed documents are material to the issues on review, this Court should remand the matter to the Bureau pursuant to 5 M.R.S. § 11006(1)(B). Any proffered legislative materials would not trigger a remand because, regardless of whether the Bureau considered such, the parties are free to cite legislative materials for permissible purposes. *See Wawenock v. Dep't of Transp.*, 2018 ME 83, ¶¶ 13, 15, 187 A.3d 609.

8

### 3. The Court's rulings on the contents of the Rule 80C record.

Generally, "[j]udicial review shall be confined to the record upon which the agency decision was based . . . ." 5 M.R.S. § 11006(1). Only in certain limited circumstances can the reviewing court permit additions to the record. As relevant here those circumstances are "[i]n the case of the failure or refusal of an agency to act or of alleged irregularities in procedure before the agency which are not adequately revealed in the record, evidence thereon may be taken and determination made by the reviewing court"; "[i]n cases where an adjudicatory proceeding prior to final agency action was not required, and where effective judicial review is precluded by the absence of a reviewable administrative record, the court may either remand for such proceedings as are needed to prepare such a record or conduct a hearing de novo"; and when "[t]he reviewing court . . . require[s] or permit[s] subsequent corrections to the record." *Id.* § 11006(1)(A), (D), (2).

Plaintiffs have argued for the application of the first two for their proposed documentation and BPL has argued for application of the third for its proposed documentation. In addition to their contention that the Court can conduct a full evidentiary hearing because this is truly a declaratory judgment action, Plaintiffs have been insistent throughout that this Court may hold a de novo hearing under section 11006(1)(D) because there was no adjudicatory proceeding prior to BPL entering into the leases and effective judicial review is precluded by the absence of a reviewable administrative record. Both parties have referenced the adequacy of the administrative record at different junctures and for different reasons. However, there is a difference between having a reviewable record that can be meaningfully reviewed, and having a record that maximizes the chances of one party or the other prevailing on what might be in the record.[7] The Court

---

[7] In support of their arguments for the different remedies the parties seek, they have all – to varying degrees and at different junctures – asserted that there is no reviewable record before the Court. However, because BPL has insisted throughout this litigation that it did make a determination prior to both leases that neither

9

concludes there is a reviewable record here. The question presented then for purposes of the Rule 80C appeal is whether that record supports the final agency actions taken by BPL.

Plaintiffs' April 2 letter to the Court also contends, "Plaintiffs have made a prima facie showing of the Bureau's failure to act (i.e. make a substantial alteration determination) and of procedural irregularities." (Pl.s' Apr. 2 Ltr. p. 5.) The Law Court has only applied the "procedural irregularities" prong of section 11006(1)(A) in instances when "a showing of bad faith or improper behavior is strong enough to justify intrusion into the administrator's province." *Carl L. Cutler Co. v. State Purchasing Agent*, 472 A.2d 913, 918 (Me. 1984). Plaintiffs have not really attempted to make a showing of bad faith or improper behavior, and the Court does not find that the Plaintiffs have made a sufficient showing of bad faith or improper behavior given the Law Court's language in *Cutler*. However, the Court does find that Plaintiffs have made a prima facie showing that BPL failed to act by not making a determination regarding substantial alteration prior to entering into the leases.

The Court emphasizes two points about this finding. First, the Court understands that this is not a prima facie showing of a *typical* failure of an administrative agency to act at all because there does seem to be final agency action here (the leases). However, as the Court held in its March 17, 2021 order, the unique constitutional and statutory structure applicable to public reserved lands requires a preliminary action prior to the final agency action. It is this preliminary action for which Plaintiffs have made a prima facie showing that BPL failed to take by way of their January 7, 2021 motion. And second, this is only a prima facie showing and is not a decision on the merits of the issue.

---

would result in substantial alteration of the public reserved lands at issue, and because BPL filed a voluminous record, the Court intends to review the record and adjudge the Rule 80C issues based upon it.

*a. The September 24, 2020 memo.*

The Court first addresses what has become a contentious issue in the case: the September 24, 2020 memo. This memo – authored more than 6 years after entering into the 2014 lease, 3 months after entering into the 2020 lease, and while this case was being actively litigated – contends as follows:

> [i]n reviewing the project in 2014, the Bureau made the following findings and determinations, although not reduced to writing, with respect to the 2014 Lease based on field observations and its consideration and interpretation of applicable statutes. In 2020, the Bureau confirmed and made again these same findings and determinations, although not reduced to writing, with respect to the 2020 Amended and Restated Lease . . . ."

(A.R. I0069.) The memo asserts, on one hand, that BPL believed it was not constitutionally and statutorily obligated to make a determination regarding whether entering into the leases of the public reserved land with CMP would result in a substantial alteration to the uses of the land. On the other hand, notwithstanding the fact that BPL believed it did not have to make any determination regarding substantial alteration, the memo contends that BPL actually *did* make such determinations in both 2014 and 2020, even though BPL has to concede that it did not contemporaneously document any aspects of such determinations either in late 2014 or early summer 2020.

This memo is highly peculiar in the realm of administrative action. It reads like a legal brief; it purports to document findings, determinations, and conclusions made but not contemporaneously reduced to writing not only once, but twice; and it even goes out of its way to identify two legislators who happen to be named plaintiffs in this case and who would have received annual reports from BPL in which the already-executed 2014 lease to CMP was noted in order to explain that BPL "understood and interpreted this to mean that no legislative approval . .

11

. was required." (A.R. I0069.)  As the Court noted in the December 21, 2020 order on the motions to dismiss, the September 24, 2020 memo appears to be a post hoc justification of BPL's actions in 2014 and 2020.

BPL contends that post hoc rationalizations are permissible additions to administrative records, citing three D.C. Circuit Court cases.  These D.C. Circuit Court cases stand for the following propositions:

> Courts "review an agency action based solely on the record compiled by the agency when issuing its decision, not on some new record made initially in the reviewing court. . . . [R]eviewing courts [are permitted] to rely on post hoc declarations in certain situations when the declarations have come from the relevant agency decisionmaker. . . . [Courts are] barred consideration of post hoc materials when they present an entirely new theory, or when the contemporaneous record discloses no basis for the agency determination whatsoever.  [Courts] can permit consideration of post hoc materials when they illuminate the reasons that are already implicit in the internal materials.

*Rhea Lana, Inc. v. Dep't of Labor*, 925 F.3d 521, 524 (D.C. Cir. 2019) (alterations from original, citations, and quotation marks omitted); *cf. Maine v. Shalala*, 81 F. Supp. 2d 91, 94 (D. Me. 1999) ("[I]t is . . . a well-settled rule of law that the agency must have provided a valid basis for its action at the time the action was taken.").  BPL cites *Rhea Lana* and contends the "memo is a fuller explanation of the Bureau's reasoning at the time it acted, and is rooted in the Bureau's record and legislative interactions . . . ."  (BPL Opp. to Mot. re: Record p. 17 (Jan. 15, 2021).)  However, in *Rhea Lana*, "the Declaration largely echoe[d] the rationale contained in the contemporaneous record." *Rhea Lana*, 925 F.3d at 524.

BPL has not pointed to – nor has the Court been able to find – anything in the record that expresses a contemporaneous rationale of the kind referred to in *Rhea Lana*, either in 2014 or 2020.  More fundamentally, the Court is not aware of any Maine court that has permitted post hoc

12

justifications such as the September 24, 2020 memo; BPL has not cited one. BPL is essentially asking this Court to create new substantive law about the nature of permissible review by the Superior Court in reviewing agency actions, and the Court declines BPL's request to do so. The Court therefore strikes it from the administrative record. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, ___US___, 140 S. Ct. 1891, 1909 (2020) (alterations, citations, and quotation marks omitted) ("Considering only contemporaneous explanations for agency action also instills confidence that the reasons given are not simply convenient litigating positions. Permitting agencies to invoke belated justifications, on the other hand, can upset the orderly functioning of the process of review, forcing both litigants and courts to chase a moving target.").

  *b. The remainder of proposed modifications and corrections to the record.*

  As all parties seem to agree, legislative materials can be cited for permissible purposes as part of the merits briefing. CMP objects to Plaintiffs' use of Director Cutko's recent testimony before the Legislature, particularly Plaintiffs' unofficial transcript. However, Plaintiffs also linked to the video of that testimony, which would be the best evidence of it in any event. Therefore, because the parties can cite to the relevant legislative information as part of the merits briefing as it is and because it is clearly relevant to what is looming in the merits briefing, the Court permits the record to be supplemented with the legislative material proposed by Plaintiffs in the April 2 letter (Exhibits A-C). In addition, because the six email chains offered by Plaintiffs on April 14 simply complete email chains that already exist in the record filed by BPL or provide context for others, the Court accepts those as corrections to the record pursuant to section 11006(2).[8]

---

[8] BPL objected (and CMP joined the objection) to Exhibit 6 (an email string running from June 24-25, 2020) from the April 14 filing because

> [t]he Bureau's 2020 lease to CMP took effect on June 23, 2020, which is
> the date the Bureau executed the lease. (A.R. I0012.) No part of Plaintiffs'
> proposed Exhibit 6 existed at the time the Bureau executed the lease.

Further, although CMP objects to most of the proposed documents offered by Plaintiffs to be added to the record in the January 7 motion, BPL – the pertinent agency actor here – does not. The Court accepts BPL's position regarding the numbered exhibits. Therefore, Plaintiffs' proposed exhibits 1-3, 5-7, 8 (pages 201-243 only), and 9-11 from the January 7 filing are part of the record. The Court agrees with BPL that Exhibits 4 (the DEP permit that is not specifically limited to Johnson Mountain Township and West Forks Plantation and encompasses a different issue than that before BPL), pages 1-200 of Exhibit 8 (Andy Cutko's testimony before the DEP as a private citizen before he became Director of BPL as well as other transcribed testimony before the DEP), and Exhibit 12 (CMP's lease with the Passamaquoddy Tribe for a different portion of the corridor) are not proper for inclusion in the record. Additionally, the Court does not find Plaintiffs' proposed Exhibit D from Plaintiffs' April 2 letter to be appropriate for inclusion in the record. Because the Court is not modifying the record on the basis of section 11006(1)(D), and because Plaintiffs have not made a prima facie showing of "procedural irregularities" as the Law Court has defined that concept in the *Carl L. Cutler* case, the proposed affidavits and deposition testimony are not proper additions to the record.

Finally, though BPL offered them in the event the Court were to deny Plaintiffs' request to strike the September 24, 2020 memo, the Court nonetheless permits the correction of the record offered by BPL with the five documents listed in its April 2 filing, including the two Prescription

---

Consequently, the Bureau could not have considered that email string with respect to the 2020 lease and did not consider that email string with respect to the 2020 lease.

(BPL Obj. pp. 1-2 (Apr. 16, 2021).) However, BPL itself included in its filing of the certified record a July 30-August 3, 2020 email chain – among a few other post-June 23 items – in which David Rodrigues emailed BPL's Western Region Lands Manager to ask if there were "any constructed recreational facilities on" West Forks Plantation and Johnson Mountain Township. (A.R. VIII0109.) BPL very clearly could not have considered such information with respect to the 2020 lease, yet it has asked the Court to include that information, nonetheless. The Court finds BPL's position on this issue to be without merit.

Review and Multiple Use Coordination Reports objected to by Plaintiffs. The harvests referenced by the two Prescription Review and Multiple Use Coordination Reports are discussed in the Upper Kennebec Region Management Plan that is already part of the record. (*E.g.*, A.R. II0093.)

4. Advancing to merits briefing on the Rule 80C appeal.

BPL and CMP contend that the Court must remand the matter to BPL should the Court admit any additional documents into the record or strike the September 24, 2020 memo. *See* 5 M.R.S. § 11006(1)(B). However, as the Court advised the parties in the last conference, no party should be expected to make meaningful arguments about the multiple issues presented in this appeal, including arguments about proposed remedies which could include remand, until that party knows what the administrative record contains. It is the intent of this Order to provide such notice to the parties.

## II. THE DECLARATORY JUDGMENT RECORD

From the beginning of this litigation the Plaintiffs have insisted that the Court should develop the factual record not only in their Rule 80C appeal, but also because it has brought a Declaratory Judgment count which survived BPL and CMP's motions to dismiss it. As stated above, now that the parties have before them the administrative record, they are free to make any arguments they wish regarding what the Court should order in the Rule 80C appeal, including what if any remedies are appropriate under Maine law.

However, with respect to the Declaratory Judgment count, the Court limited the scope of that claim in its December 21, 2020 Order on Defendants' Motions to Dismiss Count 1 and 2. In that Order the Court concluded that, with respect to the 2014 lease, Plaintiffs should be permitted to argue that it is void for lack of a CPCN and, as to the constitutional claims it was making, whether a constitutional violation occurred before any administrative process was available to

15

them. In addition, with respect to both leases, the Court permitted the Plaintiffs to argue that, given the unique constitutional provision at issue, BPL was required to provide a meaningful administrative process to them but failed to do so. Further, the Court permitted the Plaintiffs to argue in the declaratory judgment portion that, as a matter of law, Legislative approval of both leases was constitutionally required.[9]

These arguments by the Plaintiffs, as understood by the Court, are legal arguments. The Court has concluded that these arguments can be decided based upon appropriate motions made by any party, and the briefing schedule below shall provide for such legal arguments.

The entry is:

1. The administrative record is modified and corrected as detailed in this order.
2. The Court establishes the following briefing schedule for merits briefing on the Rule 80C claim as well as on motion for judgment on the Declaratory Judgment claim:
   a. Plaintiffs shall file their merits brief on the Rule 80C claim and, if they wish, for judgment on the Declaratory Judgment claim by May 5, 2021. If BPL and/or CMP wish to file a motion for judgment on that claim they shall do so by May 5, 2021, as well.
   b. BPL and CMP shall file their respective opposing Rule 80C merits briefs and opposition to any motion brought by Plaintiffs regarding the Declaratory Judgment by May 19, 2021. Plaintiffs shall file their opposition to any motion for judgment on the Declaratory Judgment claim by that date as well.
   c. Plaintiffs shall file any reply merits brief on the Rule 80C claim by May 26, 2021. Any reply by any party to any motion brought for judgment on the Declaratory Judgment shall be filed on that date as well.
   d. Oral argument shall be held on June 4, 2021, by Zoom at 10:00 am. Clerk shall send notice to counsel of record.
3. The Clerk is directed to incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

---

[9] With respect to this last issue as framed by the Court, it is understood and expected that the parties will disagree as to whether such a constitutional claim is duplicative of any relief provided under the Maine Administrative Procedure Act (MAPA). However, should the Court conclude that BPL was required in 2014 to provide an administrative process as a matter of law but failed to do so, Plaintiffs would be unable to seek a remedy under MAPA but could be entitled to a remedy under the Maine Constitution given the unique constitutional relationships between BPL and the Maine Legislature at work in this case.

16

Dated: **4/21/2021**

_____
**Hon. M. Michaela Murphy**
**Justice, Maine Superior Court**

17

STATE OF MAINE                                    BUSINESS AND CONSUMER DOCKET
CUMBERLAND, ss.                                                  Location: Portland
                                                            DKT. NO. BCDWB-CV-20-29

RUSSELL BLACK, *et al.*,                    )
                                            )
        Plaintiffs,                         )
                                            )        **ORDER ON THE APPLICATION OF**
                                            )        **ART. IX, § 23 OF THE MAINE**
v.                                          )        **CONSTITUTION TO THE BUREAU**
                                            )        **OF PARKS AND LANDS'**
ANDY CUTKO, *et al.*                        )        **AUTHORITY TO LEASE PUBLIC**
                                            )        **RESERVED LOTS**
        Defendants.                         )

Plaintiffs in this action challenge the Bureau of Parks and Lands' ("BPL") decision to enter into two leases[1] with Central Maine Power Company ("CMP") for two parcels of public reserved land in Somerset County in order to construct part of the New England Clean Energy Connect transmission corridor. After reviewing the parties' filings on Plaintiffs' Motion Regarding Record and Creation of a Factual Record, the Court discerned that the following legal issue raised by BPL[2] could be dispositive of this case: whether utility leases, pursuant to 12 M.R.S. § 1852(4), are exempt from Article IX, Section 23 of the Maine Constitution. The Court ordered the parties to brief this legal issue and held oral argument via Zoom on February 12, 2021.

After consideration of the parties' arguments on briefs and at hearing, the constitutional provision at issue, the legislation implementing that constitutional provision, and BPL's statutory leasing authority both prior to the constitutional amendment and after, the Court concludes that utility leases (including those for electric power transmission), pursuant to 12 M.R.S. § 1852(4), are not categorically exempt from application of Article IX, Section 23 of the Maine Constitution.

---

[1] The first lease was executed on December 15, 2014, while the "amended and restated" lease was executed on June 23, 2020.

[2] At the hearing the Court recalled CMP as the party highlighting the issue, but a review of the paperwork showed that it was BPL who first made this assertion.

1

BPL has been delegated the authority to manage public lands and it is also required to make a determination whether the leases result in a substantial alteration to the uses of the public land. If they do, the leases must be approved by the Maine Legislature by 2/3 vote of both chambers.

## ANALYSIS

The starting point for this analysis must be the constitutional provision itself. Article IX, Section 23 of the Maine Constitution provides:

> State park land, public lots or other real estate held by the State for conservation or recreation purposes and designated by legislation implementing this section may not be reduced or its uses substantially altered except on the vote of 2/3 of all the members elected to each House. The proceeds from the sale of such land must be used to purchase additional real estate in the same county for the same purposes.

The key question presented here is how and to what extent this amendment affected the executive branch's authority over "State park land, public lots or other real estate held by the State for conservation or recreation purposes." To determine this, the Court must review what authority had been delegated to BPL by statute before the amendment, and how that authority may have changed after the Legislature and the people of Maine enacted and then ratified this amendment. The Court agrees with the parties that this case implicates the doctrine of separation of powers as provided in the Maine Constitution. The Court also agrees with the parties that it must be mindful about the limits of the authority of the three branches as they play out in this case.

Under Maine's doctrine of separation of powers, the source and extent of authority of the executive branch has been held to be similar to the source and extent of authority of the judicial branch; by comparison, the Legislative authority to legislate is often described as "absolute."

> The authority of the executive and judicial departments is a grant. These departments can exercise only the powers enumerated in and conferred upon them by the Constitution and such as are necessarily implied therefrom. The powers of the Legislature in matters of

2

> legislation, broadly speaking are absolute, except as restricted and limited by the Constitution. As to the executive, and judiciary, the Constitution measures the extent of their authority, as to the Legislature it measures the limitations upon its authority.

*Me. Equal Justice Partners v. Comm'r*, 2018 ME 127, ¶ 40, 193 A.3d 796 (Alexander, J., dissenting) (quoting *Sawyer v. Gilmore*, 109 Me. 169, 180, 83 A. 673, 678 (1912)). The Legislature makes the laws of the State; the executive branch enforces those laws. Me. Const. art. IV, pt. 3, § 1; Me. Const. art. V, pt. 1, § 12. The Supreme Judicial Court and other courts established by the Legislature are vested with the judicial power. Me. Const. art. VI, § 1.

The parties seem to agree that, prior to the amendment, the Legislature broadly delegated authority to the executive branch to manage, sell, and lease public lands. Though the agent in charge may have been different or merged into another agency, and the location in the Maine Revised Statutes may have been different, the authority was created by statute as to what actions State agents could take with public reserved lands. Leasing for purposes of setting utility lines was one of those actions. *E.g.*, P.L. 1973, ch. 628, § 14 ("The Forest Commissioner may take the following action on the public reserved lands: . . . Lease the right, for a term of years not exceeding 25, to set poles and maintain utility lines . . . .").

While the pertinent State agent historically had robust authority over public reserved lands, it is important to note that the Legislature did make changes, some more substantive than others, over time. In 1987, the statutes setting out this delegation were relocated from title 30 to title 12. *See* P.L. 1987, ch. 737. At that time the Legislature also determined that it was in the best interest of the people of the State of Maine "that title, possession and the responsibility for the management of the public reserved lands . . . be vested and established in an agent of the State acting on behalf of all of the people of the State"; that the public reserved lands be "managed under the principles of multiple use to produce a sustained yield of products and services"; and that the public reserved

3

"lands be managed to demonstrate exemplary land management practices, including silvicultural wildlife and recreational management practices . . . ." *Id.* § 2, *codified at* 12 M.R.S. § 585(1).[3]

Remaining portions of section 585 figure prominently in the parties' statutory construction arguments.[4] Section 585(1), as quoted in the preceding sentence, explained the general purpose of the management of public reserved lands, which were to be managed under multiple-use principles. Then section 585(2) defined various terms for use in section 585, including "multiple use" (which the Court quotes in full in footnote 7, *infra*), "public reserved lands," and "sustained yield." Section 585(3) placed the "care, custody, control and responsibility for the management of the public reserved lands" in the hands of the commissioner of Conservation. It also made the commissioner responsible for "prepar[ing], revis[ing] from time to time and maintain[ing] a comprehensive management plan for the management of the public reserved lands . . . ." These plans were to "provide for a flexible and practical approach" to the management of the lands, and the commissioner was required to "compile and maintain an adequate inventory of the public reserved lands, including . . . the other multiple use values for which the public reserved lands are managed." Importantly, the management plans had to "provide for the demonstration of appropriate management practices [to] enhance the timber, wildlife, recreation, economic and other values of the lands."

Then, "[w]ithin the context of the comprehensive management plan, the commissioner, after adequate opportunity for public review and comment, [had to] adopt specific action plans for

---

[3] The statutes governing public reserved lands were located in title 12, part 2, chapter 202-B.

[4] The Court's quotations in following paragraphs are from the main volume of the 1994 publication of the Maine Revised Statutes Annotated, which did not yet include non-emergency laws from the second regular session of the 116th Legislature. The Designated Lands Act, P.L. 1993, ch. 639, which implemented the constitutional amendment at issue, was a non-emergency law from the second regular session of the 116th Legislature and became effective on July 14, 1994. Accordingly, these quotations detail the delegated authority as it existed immediately before implementation of the constitutional amendment.

each of the units of the public reserved lands system." These "action plan[s] [had to] include consideration of the related systems of silviculture and regeneration of forest resources and . . . provide for outdoor recreation, including remote, undeveloped areas, timber, watershed protection, wildlife and fish." Section 585 then proceeded in subsection 4 to describe the *actions* that the director of the (then) Bureau of Public Lands could take on the public reserved lands in the event the actions were "consistent with the management plans . . . ." Section 585(4) was where the provision permitting leasing of public reserved lands for electric power transmission was located (along with many other activities that were permitted before the amendment: setting and maintaining bridges and landing strips; laying and maintaining pipelines and railroad tracks; and, with the consent of the Governor, leasing mill privileges and other rights in land for industrial and commercial purposes, dam sites, dump sites, the rights to pen, construct, put in, maintain and use ditches, tunnels, conduits, flumes and other works for the drainage and passage of water, and flowage rights).

Not too long after the 1987 move to title 12, in 1993, the 116th Legislature proposed a momentous constitutional amendment. The genesis of this amendment is worth highlighting briefly, and the Bureau seems to recognize the constitutional amendment bore at least some legal significance. The following information was taken from the briefs of the Plaintiffs and the Bureau.

Work by an investigative journalist in the 1970s called into question how Maine had administered public reserved lands dating back to the 1800s – which included giving away over time all but 400,000 acres of the approximately 7 million acres that had originally existed. Of these remaining 400,000 acres, the State was leasing these public reserved lands at minimal cost to camp owners, paper companies, and timber companies. The 1993 constitutional amendment was proposed to place a limit on this historical practice of selling state parks and historic sites, but

5

during the legislative process its scope was expanded to include public reserved lands. As Plaintiffs highlight, the Law Court in *Cushing v. State* explained that "[t]he State holds title to the public reserved lots as trustee and is constrained to hold and preserve these lots for the 'public uses' contemplated by the Articles of Separation." 434 A.2d 486, 500 (Me. 1981) (citing *Opinion of the Justices*, 308 A.2d 253, 271 (Me. 1973)). The Law Court further noted that there were constitutional limits on the State's authority to convey interests in public reserved lands to private parties. *Id.* It follows then that the 1993 constitutional amendment can only be properly understood within the context of such limitations; which means the Court must decide what impact if any the amendment had on the State's authority to convey interests in public reserved lands to private parties.

The initial proposal read: "**Sec. 23. Alienation of state park land prohibited.** Land owned and designated by the State as a state park or memorial must continue in that use forever and may not be sold or transferred." L.D. 228 (116th Legis. 1993). And as the Bureau points out, the Legislature then expanded the scope of the proposed constitutional amendment. *See* Comm. Amend. A to L.D. 228, No. H-92 (116th Legis. 1993); Comm. Conf. Amend. A to Comm. Amend. A to L.D. 228, No. H-679 (116th Legis. 1993). The final constitutional resolve passed by the Legislature highlighted this expansion by asking the citizens of Maine if they "favor[ed] amending the Constitution of Maine to protect state park or other designated conservation or recreation land by requiring a 2/3 vote of the Legislature to reduce it *or change its purpose*." Const. Res. 1993, ch. 1, *passed in* 1993 (emphasis added). The people answered "yes" to the question, and what was approved is as follows:

> **Sec. 23.** State park land. State park land, public lots or other real estate held by the State for conservation or recreation purposes and designated by legislation implementing this section may not be reduced or its uses substantially altered except on the vote of 2/3 of

all the members elected to each House. The proceeds from the sale
of such land must be used to purchase additional real estate in the
same county for the same purposes.

Const. Res. 1993, ch. 1, *approved in* 1993.

The Court interprets this amendment as taking back from the executive branch authority previously delegated to it by the Legislature. And beginning with the 116th Legislature, and then through ratification by the people of Maine, what was taken back was the final say as to whether public reserved lands could be sold, and – pertinent here – whether the uses of the public lands could be "substantially altered." By design, the people of Maine also made any sale or substantial alteration of these lands challenging to achieve, as a supermajority vote is required in both Houses of the Maine Legislature.

Next, the Legislature enacted implementing legislation, which defined a term that is at the heart of this case: "substantially altered."

> "Substantially altered" means changes in the use of designated lands
> that significantly alter its physical characteristics in a way that
> frustrates the essential purposes for which that land is held by the
> State. . . . The essential purposes of public lots and public reserved
> lands are the protection, management and improvement of these
> properties for the multiple use objectives established in section 585
> . . . .

P.L. 1993, ch. 639, § 1 (effective July 14, 1994), *codified at* 12 M.R.S. § 598(5). As the Plaintiffs point out, there is no explicit exemption made for any particular type of property conveyance, such as for an easement or lease. What matters are two aspects: whether the use significantly alters the land's physical characteristics, and whether the alterations "frustrate" the essential purposes for which the land is held.

In addition, the Legislature made its express intent undeniably clear in implementing legislation that it was retracting authority previously delegated to BPL, and returning that authority

7

to the Legislature in particular circumstances:

> The following lands are designated lands under the Constitution of Maine, Article IX, Section 23. Designated lands under this section may not be reduced or substantially altered, except by a 2/3 vote of the Legislature. It is the intent of the Legislature that individual holdings of land or classes of land may be added to the list of designated lands under this section in the manner normally reserved for amending the public laws of the State. *Once so designated, however, it is the intent of the Legislature that designated lands remain subject to the provisions of this section and the Constitution of Maine, Article IX, Section 23 until such time as the designation is repealed or limited by a 2/3 vote of the Legislature.*

P.L. 1993, ch. 639, § 1 (emphasis added), *codified at* 12 M.R.S. § 598-A.[5] The question then becomes: what does it mean to be subject to the provisions of the Designated Lands Act (the implementing legislation) and Article IX, Section 23 of the Maine Constitution? This brings the Court to the parties' arguments on what changed (or purportedly did not change) with BPL's delegated authority over public reserved lands after the constitutional amendment was approved by the citizens of Maine and subsequently implemented by the Legislature.[6]

BPL's argument starts from the assumption that Plaintiffs are arguing the Designated Lands Act impliedly repealed BPL's leasing authority for electric power transmission. The Court does not interpret Plaintiffs' argument as being based on implied repeal. Moreover, counsel for Plaintiffs clarified at oral argument that they are not arguing implied repeal but are instead arguing that the constitution as of 1994 placed an additional condition on that leasing authority. The condition is that reductions or substantial alterations to the uses of public reserved lands must be approved by 2/3 of each House of the Legislature. This would logically mean that BPL – the agent

---

[5] Public reserved lots (or lands) were thereafter designated. *See* P.L. 1993, ch. 639, § 1; 12 M.R.S. § 585(2)(B), *repealed by* P.L. 1997, ch. 678, § 5; *see also* 12 M.R.S. § 598-A(2-A)(D).

[6] For the sake of completeness, it is worth noting that in 1995 the Legislature combined the Bureau of Public Lands and the Bureau of Parks and Recreation within the Department of Conservation into the Bureau of Parks and Lands. *See* P.L. 1995, ch. 502.

entrusted with the care and management of the public reserved lands – must make a determination whether an action would reduce or substantially alter the uses of public reserved lands before the use is "substantially altered." Unless such a determination is made by BPL, the Legislature's constitutional prerogative can be frustrated or even thwarted.

BPL's view of its authority as of 1993 is that, as to a myriad of uses of public lands, its authority has not changed at all, and that certain categories of uses are "exempt" from application of the constitutional standard and always have been. BPL asserts that the multiple-use mandate discussed in what was then 12 M.R.S. § 585 included the authority to lease public reserved lands for electric power transmission for up to 25 years. However, it is important to note that the definition of "multiple use" did not discuss electric power transmission at all. Instead, "multiple use" is defined in the context of the renewable surface *resources*.[7] Nevertheless, BPL's argument

---

[7] The full definition in section 585 (which was substantially the same as the current definition in section 1845(1)) was as follows:

> (1) The management of all of the various renewable surface resources of the public reserved lots, including outdoor recreation, timber, watershed, fish and wildlife and other public purposes;

> (2) Making the most judicious use of the land for some or all of these resources over areas large and diverse enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions;

> (3) That some land will be used for less than all of the resources; and

> (4) Harmonious and coordinated management of the various resources, each with the other, without impairing the productivity of the land, with consideration being given to the relative values of the various resources and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.

12 M.R.S. § 585(2)(A), *repealed by* P.L. 1997, ch. 678. Leases for electric power transmission arise in the provision permitting the director take *actions* consistent with the management plans (which are based on the multiple uses). Notably, each of (1) through (4) quoted above contain specific references to "resources." Additionally, CMP simply calls these "broad standards," (CMP Rebuttal Brief 5), but does not explain what is particularly broad about "the various renewable surface resources of the public reserved lots, including

is premised on the assumption that electric power transmission was an aspect of the multiple-use objectives for public reserved lands. Thus, according to BPL, when the Legislature enacted the Designated Lands Act in 1994 and defined "substantially altered" in reference to the essential purposes multiple-use mandate in section 585, it meant that public reserved lands could only be "substantially altered" by frustrating the essential purposes for which the State held the land – and one of those essential purposes was leasing the land for electric power transmission. Because of this the Designated Lands Act, according to BPL, confirms that its leasing authority was unaffected by the constitutional amendment.

However, it is important to note that if the constitutional amendment did nothing to limit or constrain BPL's leasing authority for electric power transmission projects, then the constitutional amendment also did nothing at all to limit or constrain BPL's authority to conduct a myriad of other activities, or even a combination of these activities. Taking this argument to its logical extreme would mean that *anything* that was listed in any portion of section 585 was part of the multiple-use mandate and exempt from application of the constitutional standard. Therefore, as "leas[ing] [for] mill privileges and other rights in land for industrial and commercial purposes, dam sites, dump sites, the rights to pen, construct, put in, maintain and use ditches, tunnels, conduits, flumes and other works for the drainage and passage of water, flowage rights and other rights of value in the public reserved lands" were part of the multiple-use mandate, as was leasing to "[l]ay and maintain or use pipelines and railroad tracks," and none of those could ever substantially alter the uses of the land. 12 M.R.S. § 585(4)(C)(2), (G), *repealed by* P.L. 1997, ch. 678. Plaintiffs highlight in their reply the extreme results of this reasoning:

> [t]he Bureau Director could execute leases that allowed for
> development equivalent to the Portland Jetport ("landing strip"), a

outdoor *recreation*, *timber*, *watershed*, *fish* and *wildlife* and *other public purposes* . . . ." 12 M.R.S. § 585(2)(A)(1) (emphases added), *repealed by* P.L. 1997, ch. 678.

residential subdivision ("residential leaseholds"), a massive factory ("industrial purposes"), the Maine mall ("commercial purposes"), or the Juniper Ridge Landfill (a "dump"), all without ever seeking or obtaining legislative approval, even though no one could maintain with a straight-face that these activities would not "reduce" or "substantially alter" the silviculture, wildlife, and recreation uses of the lands involved. Given that these multiple non-forest uses described in 12 M.R.S. § 1852 were also authorized actions in 1993—by then-12 M.R.S. § 585(4)—when the constitutional amendment passed, it is inconceivable that the people of Maine approved the constitutional amendment requiring super-majority legislative approval for a public lot to be reduced or its uses changed but simultaneously included a silent exception for reductions or changes resulting from all of the non-forest uses outlined in then-12 M.R.S. § 585(4).

(Pl.s' Reply Brief 14.)[8]

It would also follow from BPL's interpretation of its authority that no member of the public, no abutter to the public lands, and no "aggrieved party" could ever go to Court to argue that such leases for such activities by BPL were conveyed in excess of the agency authority as BPL seems to assert that all such activities are "exempt."

CMP's argument as to what happened regarding the leasing provisions, the Designated Lands Act, and the constitutional amendment closely mirrors BPL's. It agrees with BPL that when the Legislature enacted the Designated Lands Act in 1994, it defined "substantially altered" with reference to the multiple-use objectives detailed in section 585. That is, CMP asserts that since section 585 as a whole included the leasing authority at that time (located at 12 M.R.S. §

---

[8] BPL makes the final point that the Legislature "renewed" BPL's authority to lease public reserved lands for electric power transmission when it enacted section 1852(4) in 1997. According to BPL, because other provisions contained specific cross-references to the Designated Lands Act (e.g., 12 M.R.S. § 1851(1)), the lack of a cross-reference to the Designated Lands Act is proof that the Legislature made a conscious decision not to subject section 1852(4) to the 2/3 legislative approval requirement. The Court reviewed the legislative history to these changes but could not find any intent that could be inferred from this, particularly in contrast to the express intent contained in the Designated Lands Act's requirement that uses of public reserved land remain subject to the constitutional amendment unless the land is "undesignated" by a 2/3 vote of the Legislature. In other words, if there is a conflict between negative inferred intent and express intent, the Court must rely upon the statement of express intent.

11

585(4)(C)), leasing for electric transmission facilities was an essential purpose for which the State held the lands. CMP also points to the Legislature's claim of "no substantive changes" to the law[9] (when it moved BPL's statutory authority to the 1800s in title 12 in 1997) to mean that the law already authorized BPL to lease electric transmission facilities as an essential purpose (i.e., based on the multiple-use objectives) for which the land was held.[10] As the Court has already noted regarding BPL's assertion of this same point, however, the definition of "multiple use" spoke only in the context of renewable surface resources and said nothing of leasing for electric power transmission.

Plaintiffs, of course, in addition to their reliance on the plain language of the constitutional amendment and the "once so designated" language in the Designated Lands Act, do not agree with BPL and CMP's statutory interpretation. They argue that the leasing activities permitted by statute (both the former section, 12 M.R.S. § 585(4)(C), and the section enacted in 1997 and still in effect, 12 M.R.S. § 1852(4)) are permissible *activities* that must be consistent with the *uses* described in the management plan based upon the multiple-use objectives. In other words, counter to CMP and BPL, Plaintiffs argue that leasing for the various purposes provided in the statutory authority were not and are not "multiple-use objectives." Plaintiffs point to the requirement that "the public reserved lands be managed under the principles of multiple use," which multiple uses are defined

---

[9] As the L.D. said, "[t]here are no substantive changes from current law in this subchapter." L.D. 1852, Summary, § 4, at 76 (118th Legis. 1997).

[10] CMP does not grapple with the fact that the definition of "substantially altered" was also amended in 1997 to change the reference from section 585 to section 1847. When it was enacted in 1997, section 1847(1) became what was the purpose portion of section 585 (i.e., 12 M.R.S. § 585(1)(A)-(C)), section 1847(2) became what was the responsibility portion of section 585 (i.e., 12 M.R.S. § 585(3)), and section 1847(3) became what was a sliver of the action portion of section 585 (i.e., 12 M.R.S. § 585(4), without the additional subparts, many of which ended up in section 1852). The definitions of "multiple use" and "sustained yield" (i.e., 12 M.R.S. § 585(2)(A), (C)) became section 1845. In this sense, the 1997 enactment undercuts CMP's argument because the definition of "substantially altered" pointed to a section (section 1847) that said nothing about leasing for electric transmission lines.

as being, in part, "[t]he management of all of the various renewable surface resources of the public reserved lands including outdoor recreation, timber, watershed, fish and wildlife and other public purposes," as well as "exemplary land management practices, including silvicultural, wildlife and recreation management practices . . . ." 12 M.R.S. §§ 1845(1)(A), 1847(1). These are thus the "essential purposes" for which the State holds the land: "The essential purposes of public reserved and nonreserved lands are the protection, management and improvement of these properties for the multiple use objectives established in section 1847." *Id.* § 598(5). BPL and CMP's reliance on the original reference to section 585 in the definition of "substantially altered" does not change this because the multiple-use objectives were clearly defined in section 585 and were differentiated from the *actions* that could be taken consistent with those *uses*.

As noted in footnote 10, section 585(1), (3), and the first part of (4) became what is now section 1847. Subsection (1) made clear that "[i]t is in the public interest that the public reserved lands be managed under the principles of multiple use to produce a sustained yield of products and services," and subsection (2) then specifically tied the definitions of "multiple use" and "sustained yield" to renewable natural resources. 12 M.R.S. § 585(1)(B), (2)(A), (C), *repealed by* P.L. 1997, ch. 678. After listing these uses and the management plans necessary to effectuate these purposes, *id.* § 585(3), *repealed by* P.L. 1997, ch. 678, section 585 then proceeded to explain that the commissioner had to adopt action plans within the context of the comprehensive management plan. *Id.* § 585(3), *repealed by* P.L. 1997, ch. 678.

Following that, in a subsection titled "Actions," section 585 stated that the director could take "the following actions on the public reserved lands *consistent with the management plans for those lands* and upon such terms and conditions and for such consideration as the director considers reasonable," *id.* § 585(4) (emphasis added), *repealed by* P.L. 1997, ch. 678. Those following

13

actions included such items as leasing for electric power transmission, landing strips, pipelines, industrial and commercial purposes, etc. Therefore, leasing for electric power transmission was not a multiple-use objective but was instead an action that could be taken as long as it was consistent with the management plan.

Plaintiffs then point to the 1997 recodification of the authority statutes and additional revision to the definition of "substantially altered" as confirmation of the above interpretation for mainly the same reasons discussed in footnote 10. The 1997 amendment to the definition of "substantially altered" changed the reference from section 585 to section 1847, not sections 1847 *and* 1852. Section 1847 contained the requirement for management under the principles of multiple use as well as enactment of management plans and action plans. It did not contain any reference to leasing for electric power transmission. In this sense, the 1997 recodification and revision confirmed that leasing for electric power transmission was not a multiple-use objective.

In summary, the Court first agrees with Plaintiffs' interpretation of how Article IX, Section 23 and the Designated Lands Act affected BPL's authority over State lands, including public reserved lands. Before the constitutional amendment, BPL was vested with broad authority over public reserved lands. As has been detailed, prior to the constitutional amendment BPL could lease public reserved lands for electric power transmission for up to 25 years. That same authority exists today but it has been limited by the Maine Constitution and the Designated Lands Act. The Legislature and the people of Maine – through the constitutional amendment – retracted some of the authority previously delegated to BPL.[11] The Maine Constitution, "the supreme law of the state," *La Fleur ex rel. Anderson v. Frost*, 146 Me. 270, 280, 80 A.2d 407, 412 (1951), was

_____

[11] Unlike the Public Utilities Commission, where the Legislature has delegated essentially all of its authority, *Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 32, 237 A.3d 882, the Legislature here retained authority for itself in instances of reductions or substantial alterations to the uses of public reserved lands.

14

amended to place a condition on executive action with public reserved lands.

Second, BPL and CMP seem to want the Court to turn its attention away from what occurred in 1993 and 1994 when the amendment and Designated Lands Act were enacted and to engage instead in statutory construction. However, harmonizing language within a statute, or harmonizing statutes, is not the same as comparing a constitutional amendment (and its enabling statute) with the statutes that have been referenced in BPL and CMP's arguments. Instead of comparing only the pre-amendment and post-amendment statutes regarding utility leases, the Court must take as its starting point the constitutional amendment, and it must accord appropriate weight to what the people of Maine enacted when they ratified this amendment. In addition, to the extent any comparison between the broad language of the enabling statute and statutes that address utility leases (and many other kinds of leases and uses) that were still in effect after the amendment create any ambiguity, the Court concludes that any ambiguity must be resolved in favor of the constitutional amendment and the clear expression of intent in its enabling statute.

In sum, for this unique constitutional amendment to have any effect, the amendment itself, the Designated Lands Act, and statutes that remain on the books after the amendment must be read harmoniously. *Cf. Phelps v. United States*, 274 U.S. 341, 344 (1927) ("Acts of Congress are to be construed and applied in harmony with and not to thwart the purpose of the Constitution."); *Alliance for Retired Americans v. Sec'y of State*, 2020 ME 123, ¶ 9, 240 A.3d 45 (in the event of a conflict between the constitution and a statute, the Court must interpret in a manner that renders the statute constitutional). This constitutional amendment limited the scope of BPL's authority over public reserved lands by placing a condition on it: that public reserved lands cannot "be reduced or [their] uses substantially altered except on the vote of 2/3 of all the members elected to each House." Me. Const. art. IX, § 23. Thus, BPL is obligated to determine whether a particular

15

action (including a lease for electric power transmission pursuant to section 1852(4)) reduces or substantially alters the uses of public reserved lands before it takes that particular action.

Finally, contrary to what BPL intimated in its Rebuttal Brief, the effect of such a holding is not that the constitutional amendment says *every* action (including any section 1852(4) lease) is a substantial alteration that must be taken to the Legislature. Instead, BPL must exercise its delegated authority to make a determination on a case-by-case basis. And contrary to the statements made by CMP and BPL that any finding by the Court that the constitutional standard of "substantial alteration" applies to these leases would violate the separation of powers doctrine by abrogating the authority of the Legislature, the Court disagrees. On the contrary, the Court has attempted here to give appropriate weight to the amendment, and in doing so to respect the authority that was restored to the Legislature by the amendment. Therefore, if BPL determines that a proposed use of public lands results in "substantial alteration," the Legislative branch must be given the final say on the issue, and be able to exercise the authority that the people of Maine returned to it – their elected representatives – when they ratified Article IX, Section 23.

The entry will be: Utility leases, pursuant to 12 M.R.S. § 1852(4), are not categorically exempt from application of Article IX, Section 23 of the Maine Constitution. The Clerk shall note this Order on the docket by reference pursuant to M.R. Civ. P. 79(a). Counsel for the parties shall make themselves available to participate in a conference with the Court to establish the course of future proceedings. Clerk of the Business and Consumer Court will send notice of this conference to counsel of record for Wednesday, March 24, 2021 at 10:00 am. The conference will be conducted by Zoom and recorded by the Clerk.

Dated: 3/17/2021

Hon. M. Michaela Murphy
Justice, Maine Superior Court

16

**RUSSELL BLACK, et al**

**v.**

**ANDY CUTKO as Director of the Bureau
of Parks and Lands, State of Maine, Dept.
of Agriculture, Conservation and Forestry, et al.**

| | |
|---|---|
| **Plaintiff Counsel:** | James Kilbreth, Esq. |
| | David Kallin, Esq. |
| | *Drummond Woodsum* |
| | 84 Marginal Way,  Ste 600 |
| | Portland, ME 04101-2480 |

**Defendant Counsel:**

| | |
|---|---|
| ANDY CUTKO as Director of the Bureau of Parks & Lands, State of Maine, Dept. of Agriculture, Conservation and Forestry | Scott Boak, AAG. |
| | Lauren Parker, AAG. |
| | *Office of the Attorney  General* |
| | 111 Sewall  Street |
| | 6 State House Station |
| | Augusta, ME 04333-0006 |

| | |
|---|---|
| Central Maine Power Company | Nolan Reichl, Esq. |
| | John Aromando, Esq. |
| | *Pierce Atwood* |
| | Merrills Wharf |
| | 254 Commerical St |
| | Portland, ME 04101 |

STATE OF MAINE                          BUSINESS & CONSUMER COURT
CUMBERLAND, ss.                         DOCKET NO. BCD-CV-20-29


RUSSELL BLACK, et al.,                  )
                                        )
                PLAINTIFFS,             )
v.                                      )
                                        )
ANDY CUTKO as Director of the Bureau of )
Parks and Lands, State of Maine, Department ) **ORDER ON CENTRAL MAINE POWER**
of Agriculture, Conservation, and Forestry, ) **COMPANY'S MOTION TO DISMISS FOR**
                                        ) **LACK OF STANDING**
BUREAU OF PARKS AND LANDS, STATE )
OF MAINE, DEPARTMENT OF                 )
AGRICULTURE, CONSERVATION, AND          )
FORESTRY,                               )
                                        )
and                                     )
                                        )
CENTRAL MAINE POWER COMPANY,            )
                                        )
                DEFENDANTS.             )


Before the Court is Central Maine Power Company's ("CMP") motion to dismiss

Plaintiffs' complaint pursuant to Maine Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiffs'

complaint seeks to invalidate a lease or leases the Bureau of Parks and Lands ("BPL") entered into

with CMP for the use of 32 acres of public reserve land within Johnson Mountain Township and

West Forks Plantation (the "Lease"). As such, Plaintiffs seek declaratory and injunctive relief in

Counts I and II of their complaint, or, in the alternative, seek Rule 80C review of any final agency

action that approved of the lease described in Count III. In response, CMP filed the motion

currently before the Court, which contends that, assuming this matter falls under Rule 80C and the

Maine Administrative Procedures Act ("MAPA"), Plaintiffs do not have standing to sue.[1]  BPL

---

[1] CMP and BPL have also filed motions to dismiss the declaratory judgment counts as they allege that the
Maine Administrative Procedure Act is the only avenue of potential relief for Plaintiffs.

1

and the Department informed the Court they take no position on the issue of standing.

Plaintiffs are represented by Attorneys James Kilbreth, David Kallin, Adam Cote, and Jeana McCormick. Defendants Andy Cutko and BPL are represented by Assistant Attorneys General Lauren Parker and Scott Boak. Defendant CMP is represented by Attorneys Nolan Reichl and Matthew Altieri.

## LEGAL STANDARD

When reviewing a motion to dismiss under Rule 12(b)(6), the Court "consider[s] the facts in the complaint as if they were admitted." *Bonney v. Stephens Mem'l Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123. The complaint is viewed "in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory." *Id.* (quoting *Saunders v. Tisher*, 2006 ME 94, ¶ 8, 902 A.2d 830). "Dismissal is warranted when it appears beyond a doubt that the plaintiff is not entitled to relief under any set of facts that [it] might prove in support of [its] claim." *Id.*

The standard applicable to a Rule 12(b)(1) motion to dismiss for lack of standing is different than that applicable to a Rule 12(b)(6) motion for failure to state a claim. *Mun. Review Comm. v. USA Energy Grp.*, *LLC,* No. BCD-CV-15-22, 2015 WL 4876449, at *2 (Me. B.C.D. June 3, 2015). Because this Court's subject matter jurisdiction depends on each Plaintiff's standing, the Court "make[s] no favorable inferences in favor of the plaintiff such as [it does] when reviewing a motion to dismiss for failure to state a claim . . . ." *Tomer v. Me. Human Rights Comm'n*, 2008 ME 190, ¶ 9, 962 A.2d 335.

## DISCUSSION

MAPA provides a right to judicial review for parties "aggrieved" by final agency action pursuant to 5 M.R.S. § 11001. A person is considered aggrieved for the purposes of MAPA "if

that person has suffered particularized injury—that is, if the agency action operated prejudicially and directly upon the party's property, pecuniary, or personal rights." *Nelson v. Bayroot, LLC,* 2008 ME 91, ¶ 10, 953 A.2d 378 (citing *Storer v. Dep't of Envtl. Prot.*, 656 A.2d 1191, 1192 (Me. 1995). Generally, "the injury suffered must be distinct from any suffered by the public at large and must be more than an abstract injury." *Id.* Courts examine the issue of standing in context to determine whether the asserted effect on the party's rights genuinely flows from the challenged agency action. *Id.* In this matter, the Plaintiffs can be divided into three distinct groups, each asserting their own injuries stemming from the Leases granted by BPL: 1) Private Citizen Plaintiffs; 2) the National Resources Council of Maine ("NRCM"); and 3) Current and Former State Legislators ("Legislator Plaintiffs"). Whether or not each group has suffered particularized injury such that it qualifies as aggrieved under MAPA will be addressed in turn.

## I.      Private Citizen Plaintiffs

The first category of plaintiffs is a group of private citizens who claim a variety of personal and professional uses of the public reserve land subject to the Lease, as well as the surrounding area. In total, the group amounts to ten individuals: Edwin Buzzell, Greg Caruso, Charlene Cummings, Robert Haynes, Cathy Johnson, Ron Joseph, John R. Nicholas Jr., George Smith, Clifford Stevens, and Todd Towle.

Plaintiffs assert that, as a matter of course, members of the public who use public lands have standing to challenge a lease on those reserved lands. Despite this, the Law Court has never established a definitive right for members of the public to challenge the State's management of public lands, based on being members of the public alone. However, in *Fitzgerald v. Baxter State Park*, the Law Court addressed the meaning of "particularized injury" as it relates to private citizens' standing to challenge aspects of public land management. *Fitzgerald v. Baxter State Park,*

3

385 A.2d 189, 196 (Me. 1978).[2]

In *Fitzgerald*, five individual plaintiffs sought injunctive relief restraining the Baxter State Park Authority (the "Authority") from the use of heavy equipment when cleaning up areas of timber blow-down in the park. *Id.* at 194. On appeal to the Law Court, the central issue was whether the "five individual plaintiffs, as Maine citizens, domiciliaries, voters and property owners, and actual *users* of Baxter State Park" had standing to challenge the Authority's management decisions. *Id.* at 196. To make such a determination, the Law Court considered the plaintiffs' allegations to determine whether the plaintiffs suffered particularized injury.

Crucial to the Law Court's determination were the allegations made by each of the plaintiffs that they had substantially used Baxter State Park in the past and planned to use it substantially in the future. *Id.* at 197. Because the plaintiffs had established their actual use of the park, the Law Court stated that the plaintiffs' allegations established "a direct and personal injury . . . to their interest in Baxter State Park, which, although not an economic interest in the sense of involving their livelihood or financial liability, is nonetheless worthy of protection of the law." Thus, the Law Court decided the plaintiffs had suffered a particularized injury and had standing.[3]

In the matter currently before the Court, the public reserved lands subject to the Lease are kept as a public trust, and full and free public access to the public reserve lands is the privilege of every citizen of the State. 12 M.R.S. § 1846(1). To this end, the State, for the public benefit, has

---

[2] CMP takes issue with Plaintiffs' argument that standing is "prudential" and not statutory, and that this Court must consider the issue standing within the confines of Rule 80C jurisprudence. *Fitzgerald* was not a Rule 80C action, but the Law Court nevertheless held the Plaintiffs to the standard of whether they were "aggrieved" in the sense of having suffered "particularized injury." The Court therefore disagrees with CMP that *Fitzgerald* has little or nothing to offer the Court in conducting the standing analysis in this case.

[3] The Law Court also stated, "[a]ny citizen of Maine who shows himself to have suffered 'particularized injury' as a result of the action of the Baxter State Park Authority has standing to obtain judicial review and to seek injunctive relief against that proposed action." *Id.* at 197.

4

vested title, possession, and the responsibility for the management of the public reserved lands in the BPL. 12 M.R.S. § 1847(1). This arrangement is not unlike the relationship between Baxter State Park and the Authority in *Fitzgerald*, where the Law Court noted that the Legislature created the Authority by statute to manage and regulate use of the park in accordance with "the grand design of Governor Baxter's gift to the people of Maine." *Fitzgerald*, 385 A.2d at 195. Importantly, the Court in *Baxter* held that by force of *statute*, any action by the Authority in operating Baxter State Park was both an action by the trustee of a charitable trust of which the Authority is the agent, and was also a governmental action in carrying out the mission and mandate imposed by statute. *Id.*

Here, the Private Citizen Plaintiffs make allegations almost identical to those made by Plaintiffs in *Fitzgerald*. For instance, Mr. Buzzell has alleged that in his work as a commercial whitewater rafting outfitter and registered Maine Guide, he has engaged in business and recreation in and around the public reserved land subject to the Lease. (First Amnd. Compl. ¶ 17.) Many of the other plaintiffs have alleged that they use lands in and around the public reserve lands subject to the Lease for recreation, while others (Mr. Smith, Mr. Joseph, and Ms. Cummings) have asserted that they use, and will continue to use, the lands for both scientific and journalistic purposes. (First Amnd. Compl. ¶¶ 19, 22, 24.) All of the Private Citizen Plaintiffs assert that the Leases and subsequent construction of the NECEC transmission line would disrupt the environment in and around the public reserve land, resulting in harm to their continued use. Applying the Law Court's analysis in *Fitzgerald* to the Private Citizen Plaintiffs' allegations, the Court finds a particularized injury, such that the Private Citizen Plaintiffs are aggrieved under 5 M.R.S. § 11001. Accordingly, the Private Citizen Plaintiffs have standing in this matter.[4]

_____

[4] In addition to the plaintiffs described as "Private Citizen Plaintiffs," Former State Senate President Richard Bennett has asserted a history of engaging in recreational activities on Maine's public lands and plans to

5

## II.     The Natural Resources Council of Maine

The second category of plaintiffs is a single organization, the NRCM. It alleges that its members have "used and plan to continue to use, the public reserved land in and around Johnson Mountain Township and West Forks Plantation for outdoor recreation, such as fishing, hunting, and hiking, as well as in their work as outdoor guides." (First Amnd. Compl. ¶ 16.) "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, and the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Conservation Law Found. v. Town of Lincolnville,* No. AP-003, 2001 WL 1736584, at *6 (Me. Super. Ct. Feb. 28, 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. Inc.,* 528 U.S. 167, 180 (2000)).

The Natural Resources Council of Maine is a non-profit organization that has a stated mission of "protecting, restoring, and conserving Maine's environment, now and for future generations." A number of the Private Citizen Plaintiffs, already determined to have standing, are also members of the Natural Resources Council of Maine. Likewise, the claims at issue, seeking the invalidation of leases of public reserved lands, are undoubtedly germane to the organization's purpose of conserving Maine's environment. Accordingly, the NRCM has standing to proceed in this matter.

## III. Current and Former Maine Legislators

The third and final category of plaintiffs in this matter is the Legislator Plaintiffs. CMP relies upon federal case law pertaining to the Article 3 standing of members of Congress to challenge institutional injuries. *See Raines v. Byrd*, 521 U.S. 811, 821 (1997); *Coleman v. Miller*,

---

continue doing so. As such, Mr. Bennett has standing in this matter regardless of the Court's determination regarding current and former Maine legislators.

6

307 U.S. 433, 436 (1939). Maine Courts have not previously decided when, or if, individual legislators have standing to sue for institutional injuries. The closest the Law Court has come to the issue was to assume without deciding that the Maine Senate had standing to bring State statutory and constitutional challenges to Maine's system of Rank Choice Voting (RCV). *See Senate v. Sec'y of State*, 2018 ME 52, ¶ 25, 183 A.3d 749.[5]

The Court, however, need not resolve the question at this stage because it finds that both the Private Citizen Plaintiffs and the NRCM have standing to challenge the BPL's alleged unconstitutional lease of public reserved land and this case will be moving forward. The Court also recognizes that some of current or former state legislators are on the ballot in the November 3rd election. The Court could revisit the question of whether Legislator Plaintiffs have standing after the election, after it rules on the other pending motions to dismiss, and should either or both of the parties wish to press the issue.

## CONCLUSION

For the reasons stated above, this Court finds that the Private Citizen Plaintiffs' substantial prior use and plans for continued use of the public reserved land subject to the Leases amount to a particularized injury such that they have standing to sue and enforce their rights. Likewise, because members of the NRCM have standing to sue as individuals for reasons germane to the organization's mission, the NRCM also has standing in this matter. Finally, the Court defers judgment on the standing of the Legislative Plaintiffs until after the upcoming November 3rd election and after it rules on the other pending motions to dismiss.

---

[5] CMP noted in oral argument that (and as the Court also recalls) in the RCV case the Senate as a whole voted to permit the named Senators to bring that Declaratory Judgment action. It does not appear that any such vote occurred in this matter.

7

The entry will be: Defendant CMP's Motion to Dismiss for lack of standing is denied.

The Clerk is instructed to enter this Order on the docket for this case by incorporating it by

reference. M.R. Civ. P. 79(a).


**October 30, 2020**___                                    _____/s_____
**DATE**                                                          **M. Michaela Murpy**
                                                                         **Justice, Business and Consumer  Docket**

8

**RUSSELL BLACK, et al**

  **v.**

**ANDY CUTKO as Director of the Bureau
of Parks and Lands, State of Maine, Dept.
of Agriculture, Conservation and Forestry, et al.**

| | |
|---|---|
| **Plaintiff Counsel:** | James Kilbreth, Esq. |
| | David Kallin, Esq. |
| | *Drummond Woodsum* |
| | 84 Marginal Way,  Ste 600 |
| | Portland, ME 04101-2480 |

**Defendant Counsel:**

| | |
|---|---|
| ANDY CUTKO as Director of the Bureau of Parks & Lands, State of Maine, Dept. of Agriculture, Conservation and Forestry | Scott Boak, AAG. |
| | Lauren Parker, AAG. |
| | *Office of the Attorney  General* |
| | 111 Sewall  Street |
| | 6 State House Station |
| | Augusta, ME 04333-0006 |

| | |
|---|---|
| Central Maine Power Company | Nolan Reichl, Esq. |
| | John Aromando, Esq. |
| | *Pierce Atwood* |
| | Merrills Wharf |
| | 254 Commerical St |
| | Portland, ME 04101 |